**ANALYTICAL & RESEARCH TECHNOLOGY, INC.,**

v.

**The UNITED STATES.**

No. 97–380C.

United States Court of Federal Claims.

Filed Aug. 8, 1997.*

Reissued for publication Sept. 18, 1997.

---

* This Opinion was originally issued on August 8, 1997, under a Protective Order dated June 11, 1997. When the Opinion was issued, the Court advised the parties that it intended to issue a redacted version of the Opinion for publication. The parties were requested to advise the Court as to the portions of the Opinion that should be redacted from the published version. The suggested redactions have been allowed, and the redacted Opinion is issued for publication this date, September 18, 1997.

Douglas L. Patin (Robert J. Symon, of counsel), Washington, DC, attorney of record for plaintiff.

Ho Sik Shin (Maj. Stuart W. Risch, Department of the Army, of counsel), Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant.

## OPINION

YOCK, Judge.

This post-award bid protest action is currently before the Court on the parties' cross-motions for summary judgment upon the administrative record pursuant to Rule 56.1 of the Rules of the United States Court of Federal Claims (RCFC). In its Complaint, the plaintiff alleges that the defendant violated federal statutory and regulatory requirements in evaluating and awarding a contract for computer and network integration and automated data processing operations support services. After a full and careful examination of the administrative record, pleadings, briefs, and other submissions of the parties, this Court grants the defendant's Motion for Summary Judgment on the Basis of the Administrative Record and denies the plaintiff's motion.

## *Factual Background*

On February 29, 1996, the United States Army Intelligence and Security Command (INSCOM) issued Solicitation No. DAHC90–95–R–0036 (the solicitation) for computer and network integration and automated data processing (ADP) operations support services for the Training and Contingency Detachment (TAC–D) of the National Ground Intelligence Center (NGIC) located in Washington, D.C., and Charlottesville, Virginia. Specifically, the solicitation contemplated the award of a base-year labor hours contract and four one-year option periods to provide NGIC with routine ADP technical support and hardware maintenance, installation, and de-installation of ADP support.

In responding to the solicitation, offerors were required to submit technical and cost proposals, and a contract was to be made to the responsible offeror whose proposal was determined to be technically superior and represented the "Best Value" to the Government, considering price and other factors. Admin. Rec. Vol. 1 at 222.[1] Moreover, section M.2b of the solicitation stated as follows:

> Award will be made to the offeror whose proposal is determined to be most superior in terms of the technical factors, subfactors and elements set forth. The offeror's proposed cost/price will be considered, but in this regard, the technical evaluation area is significantly more important than cost/price. Notwithstanding the above, cost realism (see Section L) will be an inherent consideration in the review of all proposals. Where two or more offers are considered technically equal, or where the higher cost of the most technically superior proposal is not justified by its relative merit, price will become a more important discriminator in the best value determination.

Admin. Rec. Vol. 1 at 220.

Pursuant to section L.21 of the solicitation, all offerors were required to submit the following information as part of their technical proposals:

Part 1—Executive Summary

1. References to the Administrative Record will be designated as "Admin. Rec. Vol. —— at ——," with page number references indicating the

Part 2—Technical Skills, Qualifications and Experience—Personnel

Part 3—Technical Skills, Qualifications and Experience—Corporate

Part 4—Technical Approach

*Id.* at 135.

Regarding Part 2, "Technical Skills, Qualifications and Experience —Personnel," section L.21b(*l*) of the solicitation provided that the "[t]he individuals proposed must have the requisite years of experience in each of the skill areas listed below for the labor category for which they are proposed." *Id.* The Source Selection Plan stated that "[t]he minimum experience required is three (3) years in the last five (5) for all skill areas." *Id.* at 62. According to the Source Selection Plan, an offeror could be assessed a technical score of "unacceptable," which would result in that offeror not being scored for that particular factor. *Id.* at 67. Regarding the experience of proposed personnel, the Source Selection Plan describes "unacceptable" as follows:

> The vast majority of the offeror's personnel do NOT meet the minimum recency of experience requirements and clearly do not appear to possess the technical skills, qualifications and demonstrated competence to the contract task they would be assigned.

*Id.* On the Detailed Evaluation Score Sheets, an offeror's score was "unacceptable" and, thus, zero, where it did "not meet the minimum recency of experience requirements." *Id.* at 80.

The solicitation required the following nine skill areas:

#1 Experience in UNIX operating systems software design, development and configuration management and specific experience in Solaris 1.X and 2.X.

#2 Experience in Client–Server Relational Databases and Software Applications and specific experience in Sybase, Progress, and Oracle.

#3 Experience in Imagery Exploitation Software Applications and specific experience in DIEPS.

Bates number stamp at the bottom right hand corner of the page.

#4 Experience in Asynchronous Transfer Node (ATM) [sic], TCP/IP, Cisco and Newbridge Routers and Network Management Software Applications and specific experience in Wollongon Pathway.

#5 Experience in DEC OSF/1, installation, utilities, configuration and specific experience in NIS, NFS, C2.

#6 Experience in Hardware/Software Configuration Management and Software Applications and specific experience in Autocad, Netcensus, Progress, Oracle, Applix-ware, and Wordperfect for UNIX, cc:mail for UNIX.

#7 Experience in ADP systems operations and specific experience in UNIX/Novell Fileservers, IBM/VM Mainframe, Network Management Systems, Communications Security (COMSEC).

#8 Experience in MAC OS and Electronic Publishing Software Applications and specific experience in MOSAIC, Web Servers, Framemaker, QUARK, UNIX CorelDraw.

#9 Experience in Computer Security Support, Computer Trusted Systems, Accreditations.

Admin. Rec. Vol. 1 at 136.

As originally set forth in the solicitation, the proposed labor categories and the skill areas required for each labor category were as follows:

| Proposed Labor Category | Skill Area(s) |
| --- | --- |
| Systems Analyst | 1, 2 or 3 |
| Computer Specialist | 1 or 8, 2, 3 or 5 |
| Communications Technician | 4 |
| Communications Engineer | 1, 4, 7 |
| Systems Administrator | 1, 2, 4 |
| Configuration Mgmt Specialist | 6 |
| Computer Security Analyst | 9 |
| Computer Shift Operator | 7 |

Admin. Rec. Vol. 1 at 142.

On May 30, 1996, the plaintiff, Analytical & Research Technology, Inc. (ART), submitted its initial proposal in response to the solicitation, which included technical and cost proposals.[2] From June 3 through June 14, 1996,

the Source Selection Evaluation Panel (SSEP) reviewed and scored the offerors' initial technical and cost proposals.[3] Based on the initial evaluation and scoring, Van Dyke received the highest consensus score of 150/350, FC Business received 120/350, and ART received the third highest score of 117.5/350. The SSEP determined that none of the proposals were acceptable but concluded that they could be made acceptable if supplemented with additional information.

On June 25, 1996, INSCOM issued Amendment 0004 to the solicitation, which emphasized NGIC's greater need in skill area number three for imagery and imagery exploitation. In addition, Amendment 0004 changed the skill requirements for the Systems Analyst and the Computer Specialist labor categories. Thus, the revised labor category/skill area matrix was as follows:

| Proposed Labor Category | Skill Area |
| --- | --- |
| Systems Analyst | 1, 2, and 3 |
| Computer Specialist | 1, 2, 3, 5, and 8 |
| Communications Technician | 4 |
| Communications Engineer | 1, 4, 7 |
| Systems Administrator | 1, 2, 4 |
| Configuration Mgmt Specialist | 6 |
| Computer Security Analyst | 9 |
| [Computer Shift Operator | 7] |

Admin. Rec. Vol. 1 at 105–06.

On July 8, 1996, ART submitted its revised technical and cost proposals in response to Amendment 0004.[4] From approximately July 17, 1996, through July 26, 1996, the SSEP re-evaluated the offerors' revised technical proposals in light of Amendment 0004. Based upon this evaluation, the SSEP determined that Van Dyke's proposal was technically superior and recommended that the contract be awarded to Van Dyke. The contracting officer (CO), Ms. Cheryl Jamison, took exception to that recommendation because all three of the offerors, Van Dyke, FC Business, and ART, were in the competitive range and any one of them was capable of being awarded the contract upon further discussions.

2. On that same date, FC Business Systems (FC Business) and J.C. Van Dyke & Associates, Inc. (Van Dyke), also submitted their initial proposals to the solicitation, which included technical and cost proposals.

3. Out of a total possible technical score of 350, 220 points were allocated to Part 2 of the technical proposal, i.e., the technical skills, qualifications, and experience of proposed personnel.

4. FC Business and Van Dyke submitted their revised technical proposals on the same date.

On October 2, 1996, the SSEP issued clarification and deficiency questions to ART, Van Dyke, and FC Business. Specifically, the SSEP addressed the deficiencies in each of the proposals and sought clarifications regarding the skill areas and particular resumes of each offeror's proposed personnel. On October 4, 1996, the SSEP conducted oral discussions by telephone with ART regarding the written clarification and deficiency questions.[5] By letter dated October 9, 1996, INSCOM requested that ART, FC Business, and Van Dyke each submit their Best and Final Offer (BAFO).

On October 16, 1996, ART submitted its BAFO, which included written responses to the SSEP's October 2, 1996 clarification and deficiency questions. FC Business and Van Dyke also submitted their BAFOs on the same date. From October 28, 1996, through October 31, 1996, the SSEP reviewed the offerors' BAFO proposals and reviewed each offeror's responses to the deficiency and clarification questions. Out of a possible technical score of 350, Van Dyke's BAFO technical score was 218; ART's score was 143.5; and FC Business' score was 129.2. Van Dyke's BAFO proposed cost was $13,069,300; ART's proposed cost was $17,551,097; FC Business' proposed cost was $9,976,940.

As a result of the BAFO evaluation, Van Dyke's BAFO proposal was determined to be technically superior and to represent the best overall value to the Government. Therefore, on October 31, 1996, the SSEP recommended to the CO that the contract be awarded to Van Dyke. By letter dated December 19, 1996, the CO notified ART that the contract had been awarded to Van Dyke. On December 20, 1996, ART requested a debriefing, which was conducted by INSCOM on January 22, 1997. During the debriefing, Mr. Michael Doering, chairman of the SSEP, informed ART that seventeen of the individuals it proposed were not scored because those individuals failed to meet the minimum experience requirement for proposed personnel.

On January 27, 1997, ART timely filed a protest with the United States General Accounting Office (GAO). In its protest, ART contended that INSCOM changed the evaluation criteria for key personnel and improperly evaluated ART's key personnel without affording ART a meaningful opportunity for discussion. In addition, ART contended that Van Dyke improperly substituted key personnel that were listed in its proposal for individuals not yet employed by Van Dyke at the time of its proposal. Moreover, according to ART, Van Dyke failed to comply with the mandatory experience requirements for skill area number three, for which INSCOM subsequently and improperly relaxed the requirements. Finally, ART contended that the experience requirement for the DIEPS position was unreasonable and not consistent with industry custom or usage. As a result of these alleged violations, ART requested that the GAO recommend that INSCOM properly evaluate the offers in accordance with the solicitation or amend the solicitation.[6]

On May 7, 1997, the GAO issued a decision that denied ART's protest. Specifically, the GAO found that the team approach, as explained by the agency, was consistent with the terms of the solicitation and that the agency "has been consistent throughout the evaluation process in its interpretation of the experience requirements for labor categories." Admin. Rec. Vol. 8 at 3204. In addition, the GAO found that ART misapplied the team approach and its interpretation of the team approach was "directly contrary to the solicitation's requirements regarding experience for each of the listed skill areas for given labor categories." *Id.* Moreover, the GAO determined that "ART

---

5. Telephonic discussions were also conducted with Van Dyke and FC Business on that same date.

6. On February 11, 1997, Van Dyke submitted its response to ART's protest to the GAO. The SSEP filed its Statement in response to the protest on February 13, 1997, and the CO filed her Statement on February 18, 1997. INSCOM filed its Agency Administrative Report in response to the protest on February 28, 1997. On March 27, 1997, the GAO conducted an oral hearing on ART's protest. On April 7, 1997, and on April 8, 1997, respectively, ART and INSCOM submitted their post-hearing comments. On April 11, 1997, ART filed a reply to INSCOM's post-hearing comments.

has failed to demonstrate that it was prejudiced by the alleged misleading discussions" because "ART's President specifically testified that ART could not provide many of the personnel which met what it originally [sic] understood to be the RFP's stated requirements." *Id.* at 3204–05.

On May 30, 1997, the plaintiff timely filed a Complaint for Declaratory and Injunctive Relief in this Court that seeks a review of the GAO's decision in this case. Specifically, the plaintiff alleges that the defendant violated 48 C.F.R. §§ 15.605–15.606 (1995) when it failed to apply correctly the appropriate evaluation criteria for proposed personnel. Next, the plaintiff alleges that the defendant violated 48 C.F.R. § 15.610 (1995) and the Competition in Contracting Act, 10 U.S.C. § 2305 (1994) (CICA), when it failed to conduct meaningful discussions with ART. In addition, the plaintiff alleges that the defendant violated 48 C.F.R. § 15.608 (1995) when it evaluated the offerors pursuant to unstated evaluation factors. Finally, the plaintiff alleges that the defendant engaged in disparate treatment, which was arbitrary, capricious, an abuse of discretion, and not in accordance with the law, when it failed to inform ART, but did inform Van Dyke, that its proposed personnel, who lacked the requisite experience, would not be scored. Based on these alleged actions, the plaintiff requests that this Court (1) declare that the contract was unlawfully awarded, (2) enjoin the defendant from proceeding with the performance of this contract, (3) order INSCOM to evaluate ART's proposal in accordance with the evaluation criteria set forth in the solicitation or amend the solicitation to represent the evaluation scheme actually used, and

(4) grant other and further relief, including attorneys' fees and proposal preparation costs. The plaintiff did not seek a temporary restraining order (TRO) because the defendant agreed that no action would be taken on the contract until September 1997, but did seek a preliminary injunction until the merits had been decided. This Court, in an Order dated June 4, 1997, stated that it would not rule on the plaintiff's Motion for Preliminary Injunction because the merits of this controversy could be resolved prior to the start of performance of the contract.

*Discussion*

This Court has jurisdiction over the plaintiff's post-award bid protest action. *See* 28 U.S.C. § 1491(b)(1) (1994), *as amended by* Administrative Dispute Resolution Act of 1996, Pub.L. No. 104–320, 110 Stat. 3870, 3874–75; *Cincom Sys., Inc. v. United States,* 37 Fed.Cl. 663, 669 (1997). Moreover, the plaintiff, an unsuccessful bidder, has standing to bring this action as an "interested party." 28 U.S.C. § 1491(b)(1); *Cincom Sys., Inc.,* 37 Fed.Cl. at 669–70.

■ In bid protest cases, like the present action, it is the agency's decision, not the decision of the GAO, that is the subject of judicial review.[7] *Cubic Applications, Inc.,* 37 Fed.Cl. at 341. Being by its very nature an advisory opinion, this Court is not bound by the determination of the GAO. *Id.; see also Health Sys. Mktg. & Dev. Corp.,* 26 Cl.Ct. at 1325; *Essex Electro Eng'rs, Inc. v. United States,* 3 Cl.Ct. 277, 283 (1983). Nevertheless, in reviewing a protestor's appeal to this Court, the GAO's advisory decision is made a part of the administrative record before this

7. This is not a case in which *Honeywell, Inc. v. United States,* 870 F.2d 644 (Fed.Cir.1989), applies. In that case, the United States Court of Appeals for the Federal Circuit (Federal Circuit) found that the GAO's decision, that the United States Army had properly followed procurement regulations, had a rational basis. *Id.* at 647–49; *see also IMS Servs., Inc. v. United States,* 33 Fed.Cl. 167, 183 (1995). The Federal Circuit reviewed the propriety of the GAO's decision, as well as the decision of the agency, because the agency had changed its conduct in response to the GAO's recommendation. In this case, however, INSCOM did not change its conduct in response to any recommendation of the GAO

because the GAO recommended that INSCOM's actions be upheld. *See Cubic Applications, Inc. v. United States,* 37 Fed.Cl. 339, 341 & n. 2 (1997); *Health Sys. Mktg. & Dev. Corp. v. United States,* 26 Cl.Ct. 1322, 1325 (1992). Therefore, the focus of this Court's inquiry is on INSCOM's evaluation and award of the contract to Van Dyke, not the GAO's opinion of INSCOM's actions. *See id.* Even if *Honeywell* would be found to apply to the facts of this case, this Court would still find that the GAO's decision was reasonable and rational, under all of the circumstances here present, and that the GAO's decision should be upheld.

Court, and, "in view of the expertise of the GAO in procurement matters, this court may rely upon such a decision for general guidance to the extent it is reasonable and persuasive in light of the administrative record." *Cubic Applications, Inc.*, 37 Fed.Cl. at 342; *see also Bellevue Bus Serv., Inc. v. United States*, 15 Cl.Ct. 131, 134 n. 3 (1988).

■ In reviewing an agency's procurement actions, the agency is given wide discretion in the evaluation of bids and in the application of the procurement regulations. *Bellevue Bus Serv., Inc.*, 15 Cl.Ct. at 133; *CACI Field Servs., Inc. v. United States*, 13 Cl.Ct. 718, 725 (1987), *aff'd*, 854 F.2d 464 (Fed.Cir.1988). "There is * * * a strong presumption that government officials act correctly, honestly, and in good faith when considering bids." *Cincom Sys., Inc.*, 37 Fed.Cl. at 671. Therefore, this Court cannot substitute its judgment for that of the agency if reasonable minds could reach differing conclusions but must give deference to the agency's findings and conclusions. *IMS Servs., Inc.*, 33 Fed.Cl. at 179–80; *Health Sys. Mktg. & Dev. Corp.*, 26 Cl.Ct. at 1326. Specifically:

> The court should not substitute its judgment on such matters for that of the agency, but should intervene only when it is clearly determined that the agency's determinations were irrational or unreasonable. It is the burden of the aggrieved bidder to demonstrate that there was no rational basis for the agency's determinations.

*Baird Corp. v. United States*, 1 Cl.Ct. 662, 664 (1983).

■ Thus, this Court's standard of review is extremely limited. Specifically, an agency's procurement decisions will be upheld unless the plaintiff can demonstrate that the agency's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1994); *see also* 28 U.S.C. § 1491(b)(4). This Court's inquiry is based upon an examination of the " 'whole record' before the agency; that is, all the material that was developed and considered by the agency in making its decision." *Cubic Applications, Inc.*, 37 Fed. Cl. at 342.

This matter is now before this Court on the parties' cross-motions for summary judgment upon the administrative record. The three central issues in this case are: (1) whether or not INSCOM evaluated the proposals based on the appropriate evaluation criteria set forth in the solicitation, (2) whether or not INSCOM held meaningful discussions with ART regarding deficiencies in ART's proposal, and (3) whether or not INSCOM treated all offerors fairly during written and oral discussions. In this regard, this Court must determine, via the parties' cross-motions for summary judgment, whether or not INSCOM followed the proper procedures in evaluating and awarding this contract for computer software and integration services.

■ In deciding a motion for judgment upon the administrative record under RCFC 56.1, this Court follows the same rules as for a motion for summary judgment under RCFC 56. *Nickerson v. United States*, 35 Fed.Cl. 581, 588 (1996), *aff'd*, 113 F.3d 1255 (Fed.Cir.1997). Summary judgment is properly granted when there are no genuine issues of material fact, RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–49, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986), and the moving party is entitled to judgment as a matter of law, RCFC 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). For a dispute over a material fact to be "genuine," the evidence must be such that it could cause a reasonable trier of fact to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

In deciding a motion for summary judgment, all of the facts must be construed in a light most favorable to the nonmoving party, with all reasonable inferences drawn in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *IMS Servs., Inc.*, 33 Fed.Cl. at 176. Once a moving party has supported its motion with affidavits or other evidence that would establish its right to summary judgment, the nonmoving party must respond with countering evidence sufficient to create a genuine issue. *Anderson*, 477 U.S. at 248–49, 106 S.Ct. at

2510–11; *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed.Cir. 1987). In countering a motion for summary judgment, the nonmoving party cannot rest on mere denials and self-serving conclusions, unsupported by specific facts contained in the record. *Sweats Fashions, Inc.*, 833 F.2d at 1562; *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53.

Where both parties have moved for summary judgment, each party's motion must be evaluated on its own merits, drawing all reasonable inferences against the party whose motion is being considered. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987). A court is not compelled to decide a case on summary judgment simply because both parties have submitted summary judgment motions. *Id.; Cincom Sys., Inc.*, 37 Fed.Cl. at 670. However, if the record could not lead a rational trier of fact to find for the nonmoving party, there are no genuine issues, and the motion must be granted. *Id.; Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. at 1356.

As noted above, the essential issue is whether or not INSCOM properly evaluated and awarded the contract at issue. A motion for judgment upon the administrative record, or for summary judgment, is an appropriate vehicle to scrutinize an agency's procurement actions because the issues are matters of contractual and regulatory interpretation, *see Stone Forest Indus., Inc. v. United States*, 32 Fed.Cl. 424, 426 (1994); *Alaska Am. Lumber Co. v. United States*, 25 Cl.Ct. 518, 527 (1992), and there remain no genuine issues of material fact that would preclude summary judgment at this juncture.

## A. Evaluation Criteria.

In its motion for judgment upon the administrative record, the plaintiff contends that the SSEP determined if an offeror's proposed personnel satisfied certain minimum experience requirements on a go/no-go basis, which the plaintiff alleges deviated from the evaluation scheme set forth in the solicitation. According to the plaintiff, "[n]owhere in the solicitation is there a provision for evaluating personnel by first determining compliance with stated minimum requirements (*i.e.*, a go/no-go evaluation) and * * * the Source Selection Plan does not furnish the SSEP with instructions to only score proposed personnel on a go/no-go basis * * *." Plt.'s Mot. for Judg. on the Basis of the Admin. Rec. (Plt.'s Mot.) at 19. Moreover, the plaintiff contends that "[r]ather than a go/no-go criterion, the solicitation sets forth a minimum experience requirement for proposed personnel. ART properly regarded an individual's failure to *completely* comply with the minimum experience requirements of the solicitation as a point reduction issue * * *." *Id.* at 20. The plaintiff argues that the use of a go/no-go approach should have been identified in the solicitation. Finally, the plaintiff relies on *Morse–Diesel Int'l, Inc.*, B–274499.2, *et al.* (1996), for the proposition that an agency has an additional · burden in treating a minimum experience requirement as a go/no-go requirement in a solicitation, and that if it is not specifically designated as go/no-go, the minimum experience requirement will be treated like any other evaluation criterion. The plaintiff concludes that the defendant violated the CICA and the Federal Acquisition Regulations (FAR), 48 C.F.R. § 15.510 (1995),[8] when it treated the minimum experience requirement as a go/no-go factor, instead of resulting in a point reduction, or, alternatively, when it failed to inform all of the offerors of the go/no-go requirement.

In its opposition to the plaintiff's motion for judgment, the defendant contends that INSCOM's evaluation criteria was set forth in the solicitation in clear and unambiguous terms and did not change throughout the bidding process. In addition, the defendant contends that the reasoning and holding in *Morse–Diesel Int'l, Inc.* is inapposite because the solicitation in that case stated that deficiencies would not render the proposal unacceptable but would be weighed accordingly. Moreover, the defendant argues that there is no special burden to use a go/no-go require-

---

**8.** This Court could not locate 48 C.F.R. § 15.510 in the applicable version of the FAR. This Court, however, presumes that the plaintiff is referring to 48 C.F.R. § 15.610 and will address the applicability of that section, *infra*.

ment, and the Government is not required to use the specific phrase "go/no-go" in the solicitation. Finally, the defendant contends that the plaintiff acted unreasonably in not seeking a written clarification, pursuant to 48 C.F.R. § 52.215–14 (1995), when it thought that a failure to satisfy the minimum experience requirements would simply result in a point reduction, because such an interpretation was inconsistent with the terms of the solicitation and its own prior interpretation of the solicitation requirements.

According to 10 U.S.C. § 2305(a)(2) (1994), a solicitation: shall at a minimum include—

(a) a statement of—

(i) all significant factors and significant subfactors which the head of the agency reasonably expects to consider in evaluating * * * competitive proposals (including cost or price, cost-related or price-related factors and subfactors, and noncost-related or nonprice-related factors and subfactors); and

(ii) the relative importance assigned to each of those factors and subfactors * * *

See also 41 U.S.C. § 253a(b)(*l*) (1994). In addition, according to the FAR:

At a minimum, the solicitation shall clearly state the significant evaluation factors, such as cost or price, cost or price-related factors, past performance and other non-cost or non-price related factors, and any significant subfactors, that will be considered in making the source selection, and their relative importance (see 15.406–5(c)). *The solicitation shall inform offerors of minimum requirements that apply to particular evaluation factors and significant subfactors.* Further, the solicitation shall state whether all evaluation factors other than cost or price, when combined, are—

(i) Significantly more important than cost or price;

(ii) Approximately equal to cost or price; or

(iii) Significantly less important than cost or price.

48 C.F.R. § 15.605(d)(1) (1995) (emphasis added). Moreover, "[a]n agency shall evaluate competitive proposals solely on the factors specified in the solicitation." 48 C.F.R. § 15.608(a) (1995). "When, either before or after receipt of proposals, the Government changes, relaxes, increases, or otherwise modifies its requirements, the contracting officer shall issue a written amendment to the solicitation." 48 C.F.R. § 15.606(a) (1995).

 As this Court has previously found, "[b]oth the FAR and CICA require evaluation factors and significant subfactors to be clearly stated within the RFP, including a statement of the relative importance of such factors and subfactors. * * * The precise numerical weight to be used in the evaluation need not be disclosed, however." *CACI Field Servs., Inc.,* 13 Cl.Ct. at 726. "In order to show entitlement to relief on a claim that the agency used undisclosed evaluation factors, plaintiff must prove that the government evaluated the proposals received on a significantly different basis than announced in the solicitation and that plaintiff has been prejudiced as a result." *Hydro Eng'g, Inc. v. United States,* 37 Fed.Cl. 448, 471 (1997).

 Generally, a minimum experience requirement is, by its very nature, a go/no-go requirement, the failure of which to meet renders that portion of the offeror's bid technically unacceptable. *See, e.g., In re: Integrity Int'l Sec. Servs., Inc.,* B–276012 (1997);[9] *CB Commercial Gov't Servs. Group,* B–259014 (1995); *Amtec Corp.,* 95–2 CPD ¶ 164 (1995); *George Hyman Constr. Co.,* 95–2 CPD ¶ 173 (1995); *FMB Laundry, Inc.,* 95–2 CPD ¶ 274 (1995); *Hines/Mortenson,* 94–2 CPD ¶ 67 (1994); *Babcock & Wilcox Constr. Co.,* 90–2 CPD ¶ 385 (1990). In this case, it is intrinsic to the solicitation that the requirement that proposed personnel have three years *minimum* experience within the preceding five years was a go/no-go requirement. In addition, the failure of an offeror's proposed personnel to have the minimum experience in this case would result in an unacceptable score of zero, as opposed to a

---

9. While decisions of the GAO are not binding on this Court, they can be used for general guidance when they are found to be reasonable and persuasive. *CACI Field Servs., Inc.,* 13 Cl.Ct. at 731

n. 28. This Court finds that the GAO decisions used in this Opinion are reasonable and persuasive.

requirement in which the offeror was scored in any event but would be given a point reduction for any failure to meet the solicitation requirements. Therefore, the fact that INSCOM did not specifically use the term "go/no-go" in the solicitation does not render the evaluation of the minimum experience requirement on a go/no-go basis invalid. *See Amtec Corp.*, 95–2 CPD ¶ 164 at 4 (1995) ("[A] solicitation need not identify each element to be considered by the agency during the course of the evaluation where such element is intrinsic to the stated factors or subfactors.").

In its reply brief, the plaintiff contends that "[t]here is no indication in the solicitation or any of the amendments thereto which inform offerors either expressly or implicitly that proposed personnel who did not meet the requisite experience requirements would not be scored at all." Plt.'s Opp. to Def.'s Mot. for Summ. Judg. on the Basis of the Admin. Rec. and Reply to Def.'s Opp. to Plt.'s Mot. for Summ. Judg. (Plt.'s Reply) at 8. This argument, however, is simply contrary to the express terms of the solicitation. The solicitation clearly indicated that minimum experience for proposed personnel would be a factor in the evaluation of the proposals. In addition, the solicitation stated that proposed individuals, who did not meet the minimum experience requirements, would be unacceptable and, thus, receive a technical score of zero. Although the solicitation explicitly did not mention the term "go/no-go," it was clear in the solicitation that individuals, who failed to meet the minimum experience requirements, would not be considered further. *See Hydro Eng'g, Inc.*, 37 Fed.Cl. at 473.

In addition, the plaintiff argues that in *Morse–Diesel Int'l, Inc.*, B–274499.2, *et al.*, the GAO held that "[i]f an experience requirement is not identified in the solicitation as a go/no-go criterion, it will not be treated as one, but will be treated as a minimum experience requirement subject to evaluation." Plt.'s Mot. at 23. However, based on a reading of the GAO's decision in *Morse–Diesel Int'l, Inc.*, this Court finds that it does not support the plaintiff's contention that a go/no-go requirement must be specifically

stated in the solicitation but seems to support a contrary position that a minimum experience requirement will be evaluated on a go/no-go basis unless it states otherwise, as the solicitation in *Morse–Diesel Int'l, Inc.* otherwise did state.

In *Morse–Diesel Int'l, Inc.*, the protestors argued that the agency improperly relaxed a solicitation requirement that the proposed project engineer have at least fifteen years of experience and that the winning bidder's proposal should have, therefore, been rejected. The minimum experience provision of the solicitation stated as follows:

> Proposals must meet the minimum standards established in the solicitation in order to be considered acceptable. Those proposals that don't meet a minimum standard are considered deficient, or unacceptable, for that evaluation factor or subfactor. *Individual deficiencies do not necessarily render the whole proposal unacceptable to the Government.* A proposal is considered unacceptable to the Government, as a whole, when it is deficient to the extent that, to allow an offeror to correct those deficiencies would constitute a complete rewrite of the proposal. The determination as to whether a proposal is deficient to that extent is made at the discretion of the Evaluation Board. In making such a determination, the Board will consider such things as the number and severity of the deficiencies.

*Morse–Diesel Int'l, Inc.*, B–274499.2 *et al.* at 7 (emphasis added).

Based on the language set forth above, that individual deficiencies in experience would not render a proposal unacceptable, the GAO found that the minimum experience requirement would not be considered on a go/no-go basis. However, the GAO did note that, in the absence of such language, minimum experience requirements are generally evaluated on a go/no-go basis.

> *While minimum experience requirements ordinarily must be met in order for a proposal to be considered technically acceptable (and thus eligible for award),* the above-quoted language clearly signaled to the offerors that GSA would treat a firm's failure to meet a minimum requirement as

an evaluation consideration rather than as a "go/no go" criterion for evaluation and award purposes. * * *

Under this other provision (set forth above), the agency was not required to reject a proposal as unacceptable for an unmet personnel experience requirement. Rather, the agency was to consider in its evaluation whether a particular deficiency was so material that it rendered the offer unacceptable.

*Id.* (emphasis added).

As is clear from the GAO's opinion in *Morse–Diesel Int'l, Inc.*, the minimum experience requirement of fifteen years for the project engineer was *not* considered as a go/no-go requirement because "*[i]ndividual deficiencies do not necessarily render the whole proposal unacceptable to the Government.*" *Id.* (emphasis added). To the contrary, the solicitation in this case clearly states that the failure to meet the minimum experience requirements *will* render that proposed individual *unacceptable* and, thus, that individual will receive a score of zero on the technical evaluation. Therefore, this Court finds that the plaintiff's reliance on the GAO's opinion in *Morse–Diesel Int'l, Inc.* is clearly misplaced.

Moreover, the solicitation set forth the relative weight assigned to the minimum experience requirement of three years; namely, that three years was the minimum and, therefore, any experience less than three years would not be acceptable and would not be scored by the SSEP. The go/no-go requirement relating to proposed personnel's minimum experience clearly was encompassed by the solicitation's evaluation scheme. Therefore, this Court finds that the evaluation factors, including the go/no-go requirement regarding minimum experience, were not contrary to the solicitation requirements but were both reasonable and consistent with the solicitation's stated evaluation scheme. INSCOM properly excluded from ART's proposal those personnel who did not meet the minimum experience requirement that was set forth in the solicitation. *See CB*

*Commercial Gov't Servs. Group*, B–259014 (1995); *George Hyman Constr. Co.*, 95–2 CPD ¶ 173 (1995).

 Finally, in its reply brief, the plaintiff contends that the solicitation provision regarding the minimum experience requirement for proposed personnel (*i.e.*, go/no-go) is latently ambiguous because it "spawned several different bidding strategies for proposed personnel by offerors that conflicted with the Army's interpretation of this provision * * *." Plt.'s Reply at 3. A contract is ambiguous when it is reasonably susceptible to more than one interpretation. *Diggins Equip. Corp. v. United States*, 17 Cl.Ct. 358, 360 (1989). "A latent ambiguity is a hidden or concealed defect which is not apparent on the face of the document, could not be discovered by reasonable and customary care, and is not so 'patent and glaring as to impose an affirmative duty on plaintiff to seek clarification.'" *Id.* (quoting *Avedon Corp. v. United States*, 15 Cl.Ct. 771, 777 (1988)).

In this case, it is clear that the minimum experience requirement was a go/no-go requirement and that the provision, therefore, was not latently ambiguous. Section L.21b(1) of the solicitation required that proposed personnel "*must* have the *requisite* years of experience * * *." Admin. Rec. Vol. 1 at 135 (emphasis added). Moreover, the Source Selection Plan defined what was the *minimum* years of experience required for proposed personnel, stated that proposed personnel would receive a score of "unacceptable" if they did not meet the minimum experience requirements, and, further, defined "unacceptable" as a numerical score of zero. Based on all of these factors, this Court finds that the minimum experience requirement is not ambiguous but is only subject to one interpretation; namely, that it is a go/no-go requirement, the failure of which to meet the minimum years of experience will result in a score of zero for that proposed individual. *See Diggins Equip. Corp.*, 17 Cl.Ct. at 361.[10]

10. The plaintiff also contends that the record does not support the GAO's conclusion and the defendant's argument that the purpose or intent

of Amendment 0004 was to clarify the minimum experience requirement for proposed personnel. This Court agrees with the plaintiff that the *pur-*

This Court finds that the minimum experience requirement, as it was set forth in the solicitation, was clearly a go/no-go requirement. Further, the solicitation and the Source Selection Plan clearly set forth the scoring applicable to the minimum experience requirement; namely, that the failure of a proposed individual to have three years of experience in the last five years would have rendered that individual unacceptable and, thus, a technical score of zero. *See CACI Field Servs., Inc.,* 13 Cl.Ct. at 729. In evaluating all of the offerors' proposals, the SSEP utilized the evaluation factors set forth in the solicitation and properly found that many of ART's proposed personnel lacked the minimum experience required. *See id.* at 728. Therefore, this Court cannot find that INSCOM's evaluation and award of the contract were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See Cubic Applications, Inc.,* 37 Fed. Cl. at 358–62; *Shields Enters., Inc. v. United States,* 28 Fed.Cl. 615, 632 (1993).

B. Meaningful Discussions.

█ Next, the plaintiff contends that Mr. Doering, the SSEP chairman, informed ART that "minimum experience requirements for proposed personnel could be satisfied under a 'team approach'," Plt.'s Mot. at 25, whereby an offeror could propose several individuals to satisfy all of the skill areas and subskills required by each labor category. According to the plaintiff, the SSEP used, however, an evaluation scheme different from the team approach. ART contends that the SSEP's alleged oral instructions to it regarding the team approach, while applying a different methodology, were misleading and, thus, did not meet the Government's duty to conduct *meaningful discussions.* In addition, the plaintiff contends that the SSEP was on con-

structive notice that ART misinterpreted the solicitation requirements based on Mr. Doering's explanation of the team approach when seventeen of its proposed personnel were not scored in its BAFO submission, and the SSEP should have reopened discussions to permit ART and the other offerors to revise their proposals after a clarification of the solicitation requirements.

In its opposition to the plaintiff's motion for judgment, the defendant contends that ART's allegations regarding Mr. Doering's statements about the team approach are unfounded and were rebutted by Mr. Doering's testimony at the GAO hearing. According to Mr. Doering, while he did discuss the team approach with ART during oral discussions, it was in the context of ART satisfying the subskill requirements for each skill. Mr. Doering never informed ART that it could employ the team approach to propose individuals for specific skill areas without them meeting the other skill areas necessary for a particular labor category. In addition, the defendant argues that ART, again, should have sought written clarification regarding the use of a team approach, as its interpretation was contrary to the solicitation and to its own prior interpretation of the solicitation requirements. Moreover, assuming *arguendo* that Mr. Doering made those oral statements regarding the team approach as alleged by the plaintiff, the defendant contends that, pursuant to 48 C.F.R. § 52.215–14, those oral explanations were not binding on the Government. Finally, the defendant contends that it was not on constructive notice of ART's misinterpretation of the solicitation requirements because ART had the second highest technical score and "[t]here was nothing, therefore, remarkable about ART's score that should have led the SSEP to be-

pose of Amendment 0004 was not to define the minimum experience requirement but, as the plaintiff contends, "to emphasize the Army's needs in the imagery and imagery exploitation skill area * * *." Plt.'s Reply at 4. However, this Court does agree with the defendant that the effect, but not necessarily the *purpose,* of Amendment 0004 was to clarify the minimum experience requirement for proposed personnel. Specifically, Amendment 0004 changed the skill area requirements for the Systems Analyst labor category from "1, 2 *or* 3" to "1, 2, *and* 3," and the

skill area requirements for the Computer Specialist labor category from "1 *or* 8, 2, 3 *or* 5" to "1, 2, 3, 5, *and* 8." Admin. Rec. Vol. 1 at 105–06, 142 (emphasis added). These changes emphasized the need for an individual proposed for a specific labor category to meet the minimum experience requirement for all skill areas in that labor category. Therefore, Amendment 0004 is simply additional evidence that the solicitation unambiguously set forth a minimum experience requirement that was to be evaluated on a go/no-go basis.

lieve that ART was misinterpreting the solicitation." Def.'s Mot. for Summ. Judg. on the Basis of the Admin. Rec. and Opp. to Plt.'s Mot. for Summ. Judg. (Def.'s Mot.) at 19.

According to the FAR, "the contracting officer shall conduct written or oral discussions with all responsible offerors who submit proposals within the competitive range. The content and extent of the discussions is a matter of the contracting officer's judgment, based on the particular facts of each acquisition * * *." 48 C.F.R. § 15.610(b) (1995); see also Crux Computer Corp. v. United States, 24 Cl.Ct. 223, 226 n. 4 (1991) (finding that the level of discussions between the agency and the offerors is within the discretion of the contracting officer). Implicit within section 15.610 of the FAR is the requirement that discussions with all of the offerors be "meaningful." See 48 C.F.R. § 15.610(c); Cincom Sys., Inc., 37 Fed.Cl. at 675; CACI Field Servs., Inc., 13 Cl.Ct. at 730. Specifically, as the GAO has previously found:

> Discussions, when they are conducted, must be meaningful and must not prejudicially mislead offerors. * * * Although discussions, to be meaningful, need not be all-encompassing, they must generally lead offerors into the areas of their proposals requiring amplification or correction, which means that discussions should be as specific as practical considerations permit, especially where proposal defects are largely informational in nature, in which case it is incumbent upon the agency to be as clear and precise as possible in informing an offeror of informational gaps in its proposal. * * * An agency may not inadvertently mislead an offeror, through the framing of a discussion question, into responding in a manner that does not address the agency's concerns; or that misinforms the offeror concerning its proposal weaknesses or deficiencies; or the government's requirements.

SRS Techs., 94–2 CPD ¶ 125 at 6 (1994).

In its motion for judgment, the plaintiff contends that the following factual scenario occurred:

On October 4, 1996, the SSEP conducted oral discussions by telephone with ART on the written clarification and deficiency questions. Id. [Admin. Rec. Vol. 4 at 1163–65.] During these discussions, Kevin Keyes, the President of ART raised to the Army the difficulty of locating individuals meeting the various requisite experience requirements for the labor categories, especially systems analysts and computer specialists (VT[ 11] 14:56:30). Mr. Michael Doering, the SSEP Chairman, responded that ART misinterpreted the solicitation requirements (VT 14:57:00). He advised ART to use the "team approach" of proposing personnel to aggregately fulfill the experience requirements of the solicitation (VT 14:57:15). Under the "team approach," as explained to ART by Mr. Doering, if one individual complied with the requisite experience for a particular skill area within a labor category, different individuals could be proposed to comply with the requisite experience for the other skill areas associated with that same labor category (VT 14:57:30). Mr. Keyes, in the presence of several other ART representatives during this telephone call, requested Mr. Doering to review the "team approach" concept several times and additionally raised a hypothetical in order to firmly understand and comprehend the solicitation requirements for proposed personnel (VT 15:02:20). In response, Mr. Doering stated that the hypothetical raised by Mr. Keyes correctly applied the "team approach" of proposing several persons to meet all of the experience for a particular labor category (VT 15:02:50).

Plt.'s Statement of Facts at 9–10 (footnote omitted). According to the plaintiff, during debriefing, however, the SSEP evaluated ART's proposal pursuant to a different scheme:

> According to Mr. Doering, the SSEP first determined whether an individual complied with the requisite experience in at least one subskill of each skill area associated with a labor category. If such experience was shown, the person would be evaluated under the "team approach" for compliance

---

11. VT refers to the Videotaped GAO Hearing held on March 27, 1997.

with solicitation experience requirements. If not, the person was not scored (VT 11:20:30–11:21:15). This evaluation scheme was "news" to ART and contradicted what Mr. Doering told ART during oral discussions. This evaluation scheme was not set forth in the solicitation, nor was ART informed of the foregoing during discussions (VT 11:26:30; 11:24:50). It is clear from the record that ART and FC Business received misleading instructions on the team approach than the methodology actually applied by SSEP. As a result, the SSEP failed to conduct meaningful discussions.

Plt.'s Mot. at 25–26.

In contrast to the plaintiff's contentions about the content of oral discussions, the defendant admits that Mr. Doering did allude to the team approach, but not as a way in which to achieve the skill area requirements of each labor category; instead, Mr. Doering referred to the team approach as illustrative of how the offerors *could* satisfy all of the *subskill* requirements:

> Notwithstanding the self-serving testimony of ART's own witnesses, ART's contentions were completely rebutted by the testimony of SSEP Chairman, Mr. Doering. At the GAO hearing, Mr. Doering testified regarding the oral discussions conducted with ART and FC Business regarding the experience requirements called for by the solicitation. Mr. Doering unequivocally testified that he did not inform ART that it could use a team approach to propose an individual who had the requisite experience in one required skill area, but lacked the experience in another required skill area. While admitting that he coined the phrase "team approach," Mr. Doering explained that he used the term to refer to satisfying *subskill* requirements, after initial skill requirements were satisfied, but never suggested that the skill requirements could be avoided:

> > "I do not know how the question of individual employees versus team contributions arose, I do not recollect, but it became necessary to restate that first an employee, in accordance with L.21(b),

had to first have the requisite years of experience in each of the skill areas identified in the solicitation for their labor category, that, when we proceeded to actually do the evaluation as set out in M.3 the evaluation would then look at the composite or the team of individuals who were contributing to skill area 1."

(VT 11:01:05).

Def.'s Mot. at 15–16.

Based on the entire administrative record, especially the oral testimony of Messrs. Doering and Keyes at the GAO hearing, this Court finds that Mr. Doering did not mislead ART during oral discussions regarding the team approach. It is apparent from the record that ART simply misunderstood Mr. Doering's explanation of the team approach, in particular, and the solicitation requirements, in general. Throughout the solicitation evaluation process, ART failed to comprehend the function and application of the skill, subskill, and labor category components of the solicitation, as well as how all three of the components worked together to provide computer and network integration and ADP operations support services to INSCOM.

In the written clarifications and deficiencies sent to ART, as well as during the oral telephonic discussion of those written clarifications and deficiencies, INSCOM informed ART that certain proposed individuals could not be counted in the proposal because they failed to meet the minimum experience requirements of the solicitation. Specifically, for skill area number five, INSCOM informed ART that: "Deficiency—No proposed individual has experience in this skill area. ( [ ] recency of experience is inadequate for this skill area.)." Admin. Rec. Vol. 4 at 1163. In addition, ART had a deficiency in skill area number eight: "Deficiency—No individuals proposed for this skill area. ( [ ] cannot be counted for this skill area due to inadequate recency of experience for skill area 5.)." *Id.* at 1164. Nowhere in the written clarifications and deficiencies, or during the oral discussion, is there any evidence that INSCOM informed ART that it could utilize a team approach as a substitute for proposed individuals complying with the min-

imum experience requirement.[12] As a result, these written and oral discussions should have led ART into the areas of its proposal that required correction or amplification. *See CACI Field Servs., Inc.*, 13 Cl.Ct. at 734. ART was on notice of the areas in its proposal ultimately determined by INSCOM to be unacceptable and was given the opportunity to revise these deficient areas. *See id.*

This Court, therefore, concludes that INSCOM conducted meaningful, not misleading, discussions with ART. Specifically, INSCOM advised ART of its deficiencies so that it was given an opportunity to satisfy the solicitation requirements. By informing ART that certain proposed individuals "cannot be counted" because of their inadequate recency of experience,[13] INSCOM attempted to resolve any uncertainties regarding ART's technical proposal by calling attention to the minimum experience requirements of the solicitation. *See* 48 C.F.R. § 15.610(c). Because INSCOM conducted meaningful discussions with ART, this Court finds that the evaluation and award of the contract to Van Dyke was not arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with the law.

Moreover, the plaintiff contends that, even if INSCOM did not mislead ART during oral discussions, the defendant was on constructive notice of ART's misinterpretation of the team approach concept. The general rule is that, during written or oral discussions, the CO (or, in this case, the SSEP) must "[r]esolve any suspected mistakes by calling them to the offeror's attention as specifically as possible without disclosing information concerning other offerors' proposals or the evaluation process * * *" 48 C.F.R. § 15.610(c)(4) (1995); *see also* 48 C.F.R. § 15.607(b) (1995).

■ In this case, Mr. Doering did not have any duty to call any suspected mistakes to ART's attention because it did not suspect that ART made any mistakes regarding the application of the team approach. Specifically, ART's technical score in its BAFO increased by twenty-six points from its original technical proposal, and ART moved from the third highest technical score to the second highest technical score. This *increase* in ART's technical score, therefore, could not have put the defendant on constructive notice that ART did not understand the solicitation, in general, or the team approach, in particular, because it reasonably indicates to INSCOM that ART corrected some of its prior deficiencies. In addition, according to the defendant, ART had previously complained that it was difficult to locate proposed personnel who were able to satisfy the experience requirements for the skill areas. Based on ART's complaint, it was more than reasonable for Mr. Doering and INSCOM to presume that the deficiencies in ART's bid were due to its inability to locate sufficiently qualified personnel to comply with the contract requirements. Therefore, this Court finds that the defendant was not on constructive notice of the plaintiff's misinterpretation of the team approach concept, as described by Mr. Doering, and, therefore, did not have any duty to bring ART's alleged "mistake" to its attention.[14]

12. Moreover, it is clear to this Court that ART simply misunderstood the team approach as allowing for more than one individual to meet the skill requirements for a particular labor category. To the contrary, the labor categories, *i.e.* systems analyst, communications engineer, etc., denote *individual* positions to be filled by the offerors, not positions in which several people are fulfilling the job requirements of one individual.

13. In its motion for judgment, the plaintiff contends that "the SSEP's discussion questions to Van Dyke specifically pointed out the perceived deficiencies of several individuals and stated that such persons 'could not be scored.' * * * This was the type of meaningful discussion ART expected and should have received." Plt.'s Mot. at 32. While this Court finds that INSCOM's notice

to ART of deficiencies in that certain proposed individuals "cannot be counted" constituted meaningful discussions, this Court more thoroughly addresses below the issue of whether or not this language was fair given that Van Dyke's written clarifications and deficiencies stated that certain proposed individuals "could not be scored," as opposed to "cannot be counted."

14. The plaintiff contends that it was obvious that it misinterpreted the team approach concept because Mr. Doering admitted at the GAO hearing that ART's BAFO was "seriously off the mark." VT at 11:57:30. Mr. Doering's single statement, however, does not demonstrate that he was on notice that the fact that ART's BAFO was "seriously off the mark" was due to its misinterpretation of the team approach and not because of

 Finally, ART had the responsibility to seek a written explanation or interpretation of the minimum requirements provision in the solicitation if it was confused or misunderstood the concept of the team approach. According to the FAR:

> Any prospective offeror desiring an explanation or interpretation of the solicitation, drawings, specifications, etc., must request it in writing soon enough to allow a reply to reach all prospective offerors before the submission of their offers. *Oral explanations or instructions given before the award of the contract will not be binding.*

48 C.F.R. § 52.215–14 (emphasis added). In its reply brief, the plaintiff contends that section 52.215–14 is not applicable in this case because Mr. Doering's oral instructions regarding the team approach were not in conflict with section L.21b(1), the minimum experience requirement, of the solicitation.

In this case, contrary to the plaintiff's argument, there is clearly a conflict between what ART alleged Mr. Doering orally stated regarding the team approach and what was actually set forth in the solicitation regarding the team approach because there is no mention of the team approach in the solicitation. In addition, in contrast to the team approach (as it was interpreted by ART), the solicitation clearly stated that "[t]he individuals proposed *must* have the requisite years of experience in *each* of the skill areas * * *," Admin. Rec. Vol. 1 at 135 (emphasis added), and that "the *minimum* experience required is three (3) years in the last five (5) years for all skill areas," *id.* at 62 (emphasis added).

Moreover, the explanation that ART alleges that Mr. Doering made during oral discussions on October 4, 1996, regarding the team approach is not binding on INSCOM because it was oral, not in writing.[15] Pursuant to section 52.215–14, ART was obligated to request an explanation of the team approach in *writing* and to allow INSCOM the opportunity to send a written reply to ART, as well as to all of the other offerors. ART failed to meet the requirements of section 52.215–14, which was specifically incorporated by reference into the solicitation.[16] Therefore, even if this Court were to find that Mr. Doering made the alleged oral statements to ART regarding the team approach, as ART contends, such oral statements were not binding upon INSCOM in the solicitation of this contract.

## C. Fair Treatment of All Offerors During Oral Discussions.

 The plaintiff contends that the defendant failed to treat all offerors fairly when it informed Van Dyke in written and oral discussions that some of its proposed personnel "could not be scored" because they failed to meet the minimum experience requirements but failed to inform ART that certain proposed personnel would not be scored. According to the plaintiff, "[t]he 'could not be scored' language for proposed personnel was not included in any of the clarification and deficiency questions raised to ART * * *[, and, therefore,] Van Dyke plainly had an unfair advantage over ART * * *" Plt.'s Mot. at 34. In its opposition to the plaintiff's motion for judgment, the defendant argues that the plaintiff's argument that it was not treated fairly during the bid evaluation process is unfounded and contrary to the record. According to the defendant, INSCOM's written clarifications to ART informed it that certain proposed individuals "cannot be counted," which was substantially similar to the "could not be scored" language that was used in the written clarifications and deficiencies to Van Dyke.

some other reason; namely, that ART simply did not understand the terms of the solicitation.

15. During oral argument on July 23, 1997, the plaintiff's counsel argued that the defendant's discussion with ART regarding the team approach was not set forth anywhere in the solicitation but was only an oral discussion of the team approach; therefore, ART was treated unfairly.

To the contrary, this argument only bolsters this Court's conclusions that the plaintiff did not rely on the terms of the solicitation in submitting its BAFO but, instead, relied on the oral, nonbinding, explanation of the team approach as given by Mr. Doering.

16. *See* Admin. Rec. Vol. 1 at 213.

 "Whenever the government solicits proposals * * *, it enters into an implied-in-fact contract with the offerors to treat them fairly." *Cincom Sys., Inc.*, 37 Fed.Cl. at 671. This duty of fairness extends to written and oral discussions with all of the offerors and is part of the Government's duty to conduct meaningful discussions. In order to demonstrate that the agency acted arbitrarily and capriciously and, thus, to enjoin performance of the protested contract, the plaintiff must prove, by clear and convincing evidence, that the Government breached of its implied-in-fact contract to treat all offerors fairly. *Id.*

In this case, INSCOM's written clarifications and deficiencies to Van Dyke stated, in pertinent part, as follows:

1. Skill Area 1:

Clarification—Lawrence, Nylander and Patch *resumes could not be scored* due to inadequate recent [sic] of experience in skill area 3. Scott resume shows no experience in Solaris 1.X. Pinckney resume does not show specific tasks for Solaris 1.X / 2.X and operating system administration.

2. Skill Area 2:

Deficiency—No proposed individual has experience in Progress. (Pinckney had no experience in Progress. Lawrence, Nylander and Patch *could not be scored* due to inadequate recent [sic] of experience in skill area 3.)

3. Skill Area 3:

Clarification—Lawrence, Nylander and Patch *could not be scored* due to recency of experience problems in this skill area.

Admin. Rec. Vol. 4 at 1173 (emphasis added). However, INSCOM's written clarifications and deficiencies to ART stated, in pertinent part, as follows:

5. Skill Area 5:

Deficiency—No proposed individual has experience in this skill area. ( [ ] recency of experience is inadequate for this skill area.)

* * * *

8. Skill Area 8:

Deficiency—No individuals proposed for this skill area. ( [ ] *cannot be counted* for

this skill area due to inadequate recency of experience in skill area 5.)

*Id.* at 1163–64 (emphasis added).

ART contends that, by informing Van Dyke that certain proposed personnel "could not be scored" but not using the exact same phrase in ART's written clarifications and deficiencies, it was "left in the dark" as to the type of evaluation scheme used by INSCOM. Plt.'s Mot. at 33. According to ART, the 'could not be scored" language was "a clear indication for Van Dyke that certain of its proposed personnel needed to be replaced," and, therefore, "Van Dyke plainly had an unfair advantage over ART * * *." *Id.* at 33, 34. Contrary to the plaintiff's contentions, all of the offerors were treated fairly during the written and oral discussions in that they all were furnished substantially similar information in the written clarifications and deficiencies. The plaintiff's argument that INSCOM's use of "could not be scored" to Van Dyke and "cannot be counted" to ART constituted unfair treatment is simply without merit. The record indicates that INSCOM adequately brought its concern regarding the minimum experience requirement to ART's attention during discussions. INSCOM's use of "could not be scored" and "cannot be counted" both reasonably point out the offerors' respective weaknesses regarding the recency of experience of proposed personnel. INSCOM, thus, treated ART equally in notifying it of the weaknesses in its proposal and gave ART an adequate opportunity to make its proposal more competitive.

In addition, this Court agrees with the defendant that the phrases "could not be scored" and "cannot be counted" are similar, if not "virtually * * * identical phrase[s]," Def.'s Mot. at 23, and both result in the same outcome; namely, a score of zero for proposed personnel not meeting the minimum experience requirement. *See Essex Electro Eng'rs, Inc.*, 3 Cl.Ct. at 287. ART was not relying on the written clarifications and deficiencies in a vacuum. To the contrary, the solicitation and the Source Selection Plan clearly set forth that an offeror's failure to meet the minimum experience requirements for proposed personnel would result in a

score of unacceptable, or zero, for that proposed individual. *See* discussion, *supra* at 43–46.[17]

■ ART alleges that it would have had a clearer indication that certain proposed personnel needed to be replaced and could have properly structured its proposal if INSCOM had used the phrase "could not be scored," as opposed to "cannot be counted." However, ART has not presented any evidence as to how it could have restructured its proposal, and it is apparent to this Court that ART's proposal was as complete a response to the solicitation as was possible. *See CACI Field Servs., Inc.,* 13 Cl.Ct. at 734. ART, therefore, knew or should have known the clear import of INSCOM's written clarifications and deficiencies. Moreover, neither section 15.610 nor the case law defining meaningful discussions requires the use of exactly the same words to each offeror in order to find that all of the offerors were treated fairly during discussions. INSCOM's written clarifications and deficiencies were sufficient to alert ART of its failure to meet the minimum experience requirement in the solicitation; thus, this Court concludes that INSCOM conducted fair and meaningful discussions with ART. Therefore, this Court cannot find that ART received disparate treatment or that the evaluation and award of the contract were arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law.

## D. Prejudice.

■ In its motion for summary judgment, the defendant contends that "[e]ven if one were to assume, for the sake of argument, that any of ART's allegations are true, ART cannot demonstrate that it was prejudiced by the claimed violations in the procurement process." Def.'s Mot. at 24. According to the defendant, ART was struggling to find personnel who satisfied the solicitation requirements, its technical score was significantly lower than Van Dyke's

technical score, and ART's cost proposal was $4.5 million more than Van Dyke's cost proposal and approximately $3.4 million more than the Government's estimate. In its reply brief, the plaintiff responds that "a reasonable likelihood exists that ART would have been awarded the contract but for the Army's arbitrary and capricious conduct of excluding resumes from the evaluation process for failing to meet minimum experience requirements without prior notice." Plt.'s Reply at 11. In addition, the plaintiff contends that its proposal was adversely affected by its interpretation of the team approach.

■ To prevail in a bid protest, a plaintiff must not only demonstrate that the defendant violated federal statutes or the FAR but the plaintiff must also show that the violation prejudiced it. *Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir. 1996); *CACI Field Servs., Inc.,* 13 Cl.Ct. at 725.

To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract. * * * Such a rule would make it virtually impossible for a protester ever to prevail, no matter how egregious the error in the procurement process. On the other hand, a showing of a mere possibility that the protester would have received the contract but for the error is inadequate to show prejudice. If that were sufficient, the requirement of prejudice would be virtually eliminated. The proper standard lies between these polarities.

\* \* \* \*

We think that the appropriate standard is that, to establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract.

---

**17.** During oral argument, the plaintiff's counsel further argued that Van Dyke was informed that certain "resumes" would not be scored, while ART was informed that certain "skill areas" were not counted, which amounted to unfair and unequal discussions. This argument is without merit because the written clarifications and deficiencies given to Van Dyke *and* ART clearly stated that certain *individuals* would not be scored, or counted, because they failed to meet the experience requirements for particular *skill areas.*

This is a refinement and clarification of the "substantial chance" language of *CACI, Inc.–Fed.,* 719 F.2d [1567,] 1574 [ (Fed.Cir. 1983) ]. The standard reflects a reasonable balance between the importance of (1) averting unwarranted interruptions of and interferences with the procurement process and (2) ensuring that protesters who have been adversely affected by allegedly significant error in the procurement process have a forum available to vent their grievances.

*Data Gen. Corp.,* 78 F.3d at 1562–63; *see also Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1582 (Fed.Cir.1996) (finding that the Federal Circuit's decision in *Data Gen. Corp.* did not replace the "substantial chance" test, as set forth in *Morgan Bus. Assocs. v. United States,* 223 Ct.Cl. 325, 332, 619 F.2d 892, 896 (1980),[18] with a more demanding one, but, for a bid protester to prevail, "it must establish not only some significant error in the procurement process, but also that there was a substantial chance it would have received the contract award but for that error").

This Court found, *supra,* that INSCOM did not violate any statute or regulation and did not breach any implied-in-fact contract to treat all offerors fairly during the evaluation and award of the contract. Therefore, by its very definition, there can be no prejudice sufficient to entitle the plaintiff to the relief it seeks in this action. Assuming *arguendo,* however, that this Court did find a statutory or regulatory violation or a breach of implied-in-fact contract, the plaintiff is unable to demonstrate prejudice sufficient to entitle

it to enjoin the performance of the awarded contract and to seek a re-evaluation of the offers.

Specifically, the record in this case demonstrates that ART was having difficulty locating sufficient personnel to use in this contract. Therefore, ART has not shown that it could have located, or obtained letters of commitment from, proposed personnel. In addition, it is apparent to this Court that ART misunderstood the "big picture" of the solicitation, as well as the purpose and function of the skill, subskill, and labor category components. *See Statistica, Inc.,* 102 F.3d at 1582; *Cubic Applications, Inc.,* 37 Fed.Cl. at 361–62.[19] Because of these additional weaknesses in ART's proposal, it is, therefore, highly unlikely that INSCOM would have awarded the contract to ART in the absence of the errors alleged to have been committed by INSCOM. *See Hughes Missile Sys. Co.,* 96–2 CPD ¶ 221 at 14–15 (1996). Based on these factors, but for the alleged errors, this Court finds that there was not a reasonable likelihood, or a substantial chance, that ART would have been awarded the contract because Van Dyke's BAFO proposal represented the "Best Value"[20] to the Government. ART simply has not demonstrated to this Court that it has suffered any harm as a result of the alleged errors in the procurement process and, therefore, is not entitled to relief.[21]

E. Permanent Injunction.

In its motion for judgment, the plaintiff contends that it is entitled to permanent

**18.** The "substantial chance" test, as set forth in *Morgan Bus. Assocs.,* states that "[i]f there was no substantial chance that plaintiff's proposal would lead to an award, then the Government's breach of duty did not damage plaintiff." *Id.*

**19.** The defendant also contends that prejudice cannot be found because ART's cost proposal was significantly more expensive than Van Dyke's proposal and the Government's estimate such that it cannot demonstrate that there was a reasonable likelihood that it would have been awarded the contract but for the alleged errors. Specifically, according to the defendant, ART's cost proposal was $4.5 million and $3.4 million higher than Van Dyke's proposal and the Government's estimate, respectively. The plaintiff responds that cost is not a proper focus of prejudice because the technical evaluation was more important than the cost evaluation. While this

Court agrees with the plaintiff that the technical proposals were more important than the cost proposals, the solicitation specifically states that "cost realism * * * will be an inherent consideration in the review of all proposals." Admin. Rec. Vol. 1 at 220. Therefore, this Court finds that ART's significantly more expensive proposal demonstrates that it did not have a reasonable likelihood, or substantial chance, of being awarded the contract in the absence of the alleged errors. *See Data Gen. Corp.,* 78 F.3d at 1563; *McDonald–Bradley,* 96–1 CPD ¶ 54 at 3 (1996).

**20.** *See* Admin. Rec. Vol. 1 at 222.

**21.** Nonetheless, the issue of prejudice is merely academic because this Court has found, *supra,* that INSCOM did not violate any statute, regulation, or implied-in-fact contract.

injunctive relief in this case because it, not the Government, will be harmed due to the Government's failure to include a go/no-go requirement in the solicitation, and it will lose all potential profits from this contract if it is not awarded to ART. In addition, the plaintiff contends that an injunction will promote efficiency in the procurement process by allowing ART to be evaluated according to the requirements of the FAR. According to the plaintiff, "[u]nless ART is granted the opportunity to rebid, the Army's mistakes will have been made at ART's expense." Plt.'s Mot. at 38–39.

■ This Court grants injunctive relief only in extremely limited circumstances. *C.A.C.I., Inc.—Fed. v. United States*, 719 F.2d 1567, 1581 (Fed.Cir.1983). "A frustrated bidder may obtain injunctive relief if it establishes either that the agency's actions were without a rational or reasonable basis[, *i.e.*, were arbitrary and capricious], or that a clear and prejudicial violation of an applicable procurement statute or regulation occurred." *Logicon, Inc. v. United States*, 22 Cl.Ct. 776, 782 (1991); *see also Magellan Corp. v. United States*, 27 Fed.Cl. 446, 448 (1993); *CACI Field Servs., Inc.*, 13 Cl.Ct. at 725. "The standard for a permanent injunction is a preponderance of evidence that the challenged action is irrational or unreasonable or violates an applicable procurement regulation." *Logicon, Inc.*, 22 Cl.Ct. at 783; *see also Stapp Towing Inc. v. United States*, 34 Fed.Cl. 300, 305 (1995).

First, the record indicates that the plaintiff has failed to meet its burden to show, by a preponderance of the evidence, that INSCOM's evaluation of the solicitation and award of the contract to Van Dyke were irrational or otherwise arbitrary and capricious. As this Court found, *supra*, INSCOM properly evaluated the minimum experience requirement on a go/no-go basis and evaluated all of the offerors' proposals according to the terms of the solicitation. INSCOM did not improperly deviate from the stated evaluation scheme, and it did not evaluate the proposals by any unstated evaluation factors. In addition, INSCOM properly conducted meaningful discussions with all of the offerors, including ART, regarding each offeror's deficiencies in the initial proposals. INSCOM did not mislead ART during discussions regarding the applicability of the team approach and was not on constructive notice that ART had misunderstood the terms of the solicitation. Finally, INSCOM treated all offerors fairly regarding the written clarifications and deficiencies submitted to each offeror. ART was not given unfair or disparate treatment at any time during the evaluation of the proposals.

All of the above-stated issues that the plaintiff contends were errors created by INSCOM during the evaluation of the proposals—the evaluation of the minimum experience requirement on a go/no-go basis, the explanation of the team approach, and the phrasing of the terms in the written clarifications and deficiencies—were actually caused by the plaintiff's lack of understanding of the terms and the application of the solicitation. *CACI Field Servs., Inc.*, 13 Cl.Ct. at 738. For these reasons, this Court cannot conclude that INSCOM's evaluation and award of the contract lacked a rational basis. Therefore, the plaintiff cannot obtain injunctive relief on the basis that INSCOM's actions were arbitrary and capricious.

Next, the record indicates that the plaintiff has failed to demonstrate, by a preponderance of the evidence, that INSCOM's evaluation and award of this contract resulted from a clear and prejudicial violation of the applicable procurement statutes or regulations. As this Court found, *supra*, the defendant did not violate any procurement statute or provision of the FAR in evaluating and awarding this contract. Further, there was not a reasonable likelihood, or substantial chance, that ART would have been awarded the contract, even if INSCOM had committed the alleged errors, because ART's proposal demonstrated that it lacked a fundamental understanding of the solicitation. As a result, the plaintiff has not provided this Court with sufficient evidence to demonstrate that it has been harmed prejudicially by the evaluation and award of this contract. *See IMS Servs., Inc.*, 33 Fed.Cl. at 187. Therefore, the plaintiff cannot obtain injunctive relief on the basis that there has been a

prejudicial violation of a statute or regulation.

## CONCLUSION

For the foregoing reasons, this Court grants the defendant's Motion for Summary Judgment upon the Administrative Record and denies the plaintiff's Motion for Judgment upon the Administrative Record. The plaintiff's Complaint is to be dismissed and the clerk is directed to enter judgment accordingly.

Each party is to bear its own costs.