**INFORMATION TECHNOLOGY & APPLICATIONS CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant,**

and

**RS Information Systems, Inc., Defendant–Intervenor.**

No. 01–637 C.

United States Court of Federal Claims.

Dec. 28, 2001 [1].

*Id.*

1. This opinion and order was issued under seal on December 7, 2001. Pursuant to ¶ C of the ordering language in the December 7, 2001 opinion and order, the parties were instructed to identify protected/privileged material subject to deletion. Only intervenor proposed redactions. Brackets identify where material has been deleted.

Jed L. Babbin, Washington, DC, for plaintiff. Sharon L. Babbin and Charles R. McCarthy, Jr., Washington, DC, of counsel.

Michael F. Kiely, with whom were Robert D. McCallum, Jr., Assistant Attorney General, David M. Cohen, Director, Mark A. Melnick, Assistant Director, Department of Justice, Washington, DC, for defendant. John D. Inazu, Department of the Air Force, Washington, DC, of counsel.

Mary Beth Bosco, Washington, DC, for defendant-intervenor. Robert K. Tompkins, Washington, DC, of counsel.

### OPINION AND ORDER

HEWITT, Judge.

This post-award bid protest action comes before the court on plaintiff's requests for injunctive relief and defendant's motion for summary judgment on the administrative record. Plaintiff, Information Technology & Applications Corporation (ITAC), protests the decision of defendant, United States Air Force Space Command (Air Force or agency or government), to award a contract to RS Information Systems, Inc. (RSIS or successful offeror) for Technical Services and Space Operations Support. RSIS is an intervenor in the proceeding.

On November 13, 2001, plaintiff filed with this court a Complaint for Preliminary Injunction, Permanent Injunction, and Declaratory Judgment (Complaint) together with an Application for Temporary Restraining Order and a Motion for Preliminary Injunction (collectively referred to as "plaintiff's requests for injunctive relief"), challenging the contract award to RSIS. ITAC complained that the Air Force's award decision was arbitrary, capricious, an abuse of discretion, and not in accordance with the law and applicable regulations on the grounds that: (1) the agency was biased against ITAC; (2) the agency gave more weight to three elements among the stated subfactors in its technical evaluation (overarching requirements) in violation of the RFP's terms; (3) the agency failed to account for a lack of relevant past performance by RSIS and gave irrational risk ratings both to RSIS and ITAC; (4) the agency conducted discussions with RSIS but not with ITAC; and (5) the agency relied on a flawed Independent Cost Estimate (ICE) to evaluate the reasonableness and realism of ITAC's Task Order cost proposal. Complaint ¶ 29.

For the following reasons, the court DENIES the protest.

### I. Background

On March 19, 2001, defendant issued Solicitation and Request for Proposal No. FA2550–01–R–0001 (RFP). Administrative Record (AR) at 79.[2] The RFP sought proposals for the Technical Services and Space Operations Support (TSSOS) contract to be performed at the Air Force Space Command at Schriever Air Force Base in Colorado Springs, Colorado, and at other locations as needed. Complaint ¶ 4; AR at 175, 2124. The TSSOS contract and its predecessor contract are the vehicles for the Air Force to obtain professional services in support of its Space Warfare Center.[3] Complaint ¶ 6.

---

2. The Administrative Record is numbered using a Bates stamp containing six characters, e.g. "000001;" for convenience, the court uses the real number contained in the Bates stamp number ("1" in the foregoing example).

3. In particular, the TSSOS contract required operations support, overall program management and integration, systems engineering and analysis and other applications related to the Space Warfare Center. AR at 175–76.

ITAC is one of two companies performing the predecessor contract to the TSSOS contract. *Id.* ¶ 5.

The Air Force set aside the entire TSSOS contract for small businesses. *Id.* ¶ 10. The RFP stated that the government would award a single cost-plus-award fee, indefinite quantity/indefinite delivery (ID/IQ) contract for the performance of the entire statement of work. *Id.;* AR at 80–89, 159. The single contract would be for one year with seven one-year options.[4] Complaint ¶ 10; AR at 82–89.

The RFP required offerors to submit their proposals (both orally and in writing) for the basic contract as well as for two Task Orders, including a Core Task Order and a 72–hour Task Order. AR at 138–139. The RFP also required that proposals be submitted in four separate volumes. *Id.* The past performance volume was due on April 20, 2001. AR at 142; Defendant–Intervenor RS Information Systems, Inc.'s Reply Brief (RSIS Reply) at 1. The remaining volumes of the technical and cost proposals were not due until May 10, 2001. AR at 135; RSIS Reply at 1.

#### A. Basis for Award

The RFP stated that the TSSOS contract would be awarded on the basis of adequate price competition using the best value approach. Complaint ¶ 13; AR at 159. The government sought to award the contract to the offeror giving the government the greatest confidence that it would best meet the contract requirements affordably. AR at 159.

The RFP identified four evaluation criteria: Past Performance, Mission Capability, Proposal Risk, and Cost/Price. AR at 159. The Past Performance and Mission Capability factors were of equal importance and were substantially more important than the factors of Proposal Risk and Cost/Price. *Id.* The Cost/Price factor was identified as the least important factor. *Id.*

The RFP set out rating systems for each factor and subfactor (other than price) that defendant would consider in making the source selection determination. AR at 159–163. Past Performance was to be assigned one of the following ratings: High Confidence, Significant Confidence, Confidence, Unknown Confidence, Little Confidence, or No Confidence. *Id.* at 160. The RFP incorporated the rating definitions set forth in Air Force Federal Acquisition Regulation Supplement (AFFARS) 5315.305(a)(2).[5] *Id.*

The RFP divided Mission Capability into four subfactors of equal importance: (1) Program Management and Integration, (2) Management/Maintenance of Information Systems, Computer Networks, and Databases for Internal/External S[pace] W[arfare] Center Communications, (3) Core Task Order Scenario (Written),[6] and (4) 72 Hour Contingency Task Order (oral).[7] AR at 161–162. The Mission Capability factor was evaluated by assigning a color rating to each of the four subfactors based on the offeror's ability "to meet or exceed performance and capability

---

4. The resulting contract would include a 30 to 60-day phase-in period. AR at 80. The one year base contract was to begin on October 1, 2001. *Id.*

5. AFFARS 5315.305(a)(2) provides that an offeror's past performance is evaluated and assigned a confidence rating from a six rating continuum ranging from "Exceptional/High Confidence" to "Unsatisfactory/No Confidence." AR at 2687, 2689. An "exceptional" rating means "essentially no doubt exists that the offeror will successfully perform the required effort," whereas an "unsatisfactory" rating means that "extreme doubt exists that the offeror will successfully perform the required effort." *Id.* at 2689. A "neutral" rating means that "[n]o performance record [is] identifiable." *Id.*

6. Under this subfactor, the government would evaluate an offeror's capability, methodology and approach to developing a Task Order Management Plan based on a task order provided in the RFP. AR at 162. This Core Task Order included many of the elements of the expected work over the term of the contract. Complaint ¶ 11.

7. Under this subfactor, the government would evaluate an offeror's capability, methodology, and approach to developing and delivering an oral presentation on a Task Order Management Plan for a contingency task order provided 72 hours prior to the presentation. AR at 162. This was a "short-notice" task order. Complaint ¶ 11.

objectives and associated requirements."[8] AR at 160–161, 2126; Defendant's Statement of Facts Accompanying its Motion for Summary Judgment (Def.'s Facts) ¶ 13. For a proposed capability that exceeded the stated requirements for a subfactor, the government could give the offeror positive consideration and assign a "strength" for that subfactor.[9] AR at 160.

Proposal Risk was evaluated separately for each Mission Capability subfactor. AR at 163; Def.'s Facts ¶ 15. Each subfactor was assigned a risk rating of either High, Moderate, or Low.[10] AR at 163.

Cost/Price was not scored but was evaluated for reasonableness and realism. *Id.* The RFP directed the offerors to propose their labor categories and rates for the basic contract effort against a $10 million annual budget. *Id.* at 165. The RFP stated that "[a]ny inconsistency in the proposal, whether real or apparent, between the promised performance and cost or price, should be explained in the Offeror's proposal." *Id.* at 163. The RFP further stated that "[i]f the intended use of new and innovative techniques is the basis for abnormally low estimates, the nature of the techniques and their impact on the proposed cost or price should be fully explained." *Id.* The RFP explained that "[t]he burden of proof as to cost credibility/cost realism rests with the Offeror." *Id.*

## B. The Source Selection Decision

Three offerors, including ITAC and RSIS, submitted proposals in response to the RFP.[11] AR at 2129; Def.'s Facts ¶ 6. During the evaluation process, the Air Force sent evaluation notices (ENs) to all three offerors. AR at 499–559; Def.'s Facts ¶ 7. The Air Force sent three ENs to ITAC, five ENs to RSIS, and three ENs to the third offeror. AR at 499–536, 537–545, 546–559; Def.'s Facts ¶¶ 8, 9, 10. The Air Force reviewed the responses to the ENs and evaluated each of the three submitted proposals. AR 2125; Def.'s Facts ¶ 11.

The Performance Risk Assessment Group (PRAG) evaluated the past performance portion of the submitted proposals. AR at 2125; Def.'s Facts ¶ 11. In evaluating past performance, the PRAG relied heavily on a Contractor Performance Assessment Questionnaire completed by both government and contractor personnel on various relevant and related contracts. AR at 2126. ITAC and RSIS each received a[ ] rating for Past Performance. AR at 2136, 2154, 2176.

The Source Selection Team (SSET) evaluated the Mission Capability and Proposal Risk factors. AR at 2122–2180. The SSET gave ITAC a green rating of acceptable for all four subfactors of Mission Capability. AR at 2139–2143. For the Proposal Risk factor, the SSET gave ITAC three ratings of moderate risk and one high risk rating. *Id.* The high risk rating correlated to the Core Task Order Scenario (written) subfactor. AR at 2141–2142.

The SSET gave RSIS two [ ] ratings of [ ] and two [ ] ratings of [ ] for the four subfactors of Mission Capability. AR at 2160–2164. For the Proposal Risk factor, the SSET gave

---

8. As defined in AFFARS 5315.305(a)(3), the four color ratings were blue, green, yellow, and red. AR at 2690; Def.'s Facts ¶ 13. Blue indicated an "exceptional" rating. AR at 2690. Green was "acceptable." *Id.* Yellow was "marginal" and red was "unacceptable." *Id.*

9. AFFARS 5316.301–90(n) defines a strength as "[a] significant, outstanding or exceptional aspect of an offeror's proposal that has merit and exceeds specified performance or capability requirements in a way [that is] beneficial to the Air Force." AR at 2680, 2682.

10. High risk was defined as "[l]ikely to cause significant disruption of schedule, increased cost or degradation of performance" and potentially remaining an unacceptable risk "even with special contractor emphasis and close government monitoring." AR at 163. Moderate risk was defined as potentially causing some schedule disruption and increased cost in the absence of close government monitoring. *Id.* Low risk meant "little potential to cause disruption" and that "[n]ormal contractor effort and normal Government monitoring" would be sufficient. *Id.*

11. The third offeror is not a party to this action. To avoid the inadvertent disclosure of any information regarding that offeror's proposal that is competition sensitive, proprietary, confidential, or otherwise protectable, the court refers to the offeror and its proposal in general terms only to provide context for this discussion of the procurement.

RSIS three [ ] risk ratings and one rating of [ ] risk. *Id.*

As to the Cost/Price factor, the Cost Team evaluated each proposal for the reasonableness of the cost elements and quantities, labor rates, accounting and compensation packages. AR at 2165. The Cost Team also evaluated each proposal for the realism of the proposed mix of labor categories and rates for the basic contract effort and for the written Core Task Order Scenario. *Id.* The Cost Team did not perform a Most Probable Cost analysis on ITAC's proposal because it found the proposal "unrealistic and unreasonable" based on the "minimal and out of line" proposed labor hours for the Core Task Order Scenario. *Id.* For the RSIS proposal, the Cost Team performed a Most Probable Cost analysis of the written task order and the $10 million basic effort.[12] *Id.*

The SSET documented the analysis of the three offers in a Proposal Analysis Report (PAR) dated July 11, 2001. AR at 2122–2180. Based on the PAR, the SSET determined that RSIS was the lowest priced and highest technically rated offeror. AR at 2168, 2176.

The SSET recommended awarding the TSSOS contract without discussions to RSIS during a briefing with the Source Selection Authority (SSA), Lt. Gen. Roger DeKok, on July 18, 2001. AR at 2181–2238. Reviewing the PAR, the SSA determined that the contract award should be made to RSIS. AR at 2253–2257. The SSA documented the award decision in the Source Selection Decision Document. *Id.*

By letter dated July 23, 2001, the contracting officer, Robert J. Wind, notified ITAC of the decision to award the TSSOS contract to RSIS. Complaint ¶ 18; AR at 22–24. The Air Force provided ITAC a pre-award debriefing on July 31, 2001. AR at 30.

On August 6, 2001, ITAC filed a bid protest with the General Accounting Office (GAO).[13] AR at 2. Pending resolution of the GAO protest, the Air Force stayed the award of the contract to RSIS. Def.'s Facts ¶ 22. The GAO denied ITAC's protest on November 7, 2001. *Information Technology & Applications Corp.*, B–2888510, B–288510.2, November 7, 2001. The Air Force awarded the TSSOS contract to RSIS on November 7, 2001. Def.'s Facts ¶ 24. ITAC filed a post-award bid protest with this court on November 13, 2001. Complaint at 1.

Further to the agreement of the parties during a status conference held in this matter on November 14, 2001, and by Order dated November 15, 2001, the court consolidated plaintiff's requests for injunctive relief with a final hearing on the merits in order to resolve the matter expeditiously. *See* Transcript of November 14, 2001 Status Conference (Conf. Tr.) at 32–36, 41, 74–75, 80; Order dated November 15, 2001. The parties addressed the merits of the case through responsive briefing to plaintiff's requests for injunctive relief and the motion for summary judgment on the administrative record filed by defendant. *See* Order dated November 15, 2001; Memorandum of Points and Authorities in Support of Plaintiff's Application for Temporary Restraining Order, Motion for Preliminary Injunction, Permanent Injunction and Declaratory Judgment (Pl.'s Mem.); Defendant's Opposition to Plaintiff's Requests for Injunctive Relief and Defendant's Motion for Summary Judgment Upon the Administrative Record (Def.'s Opp. and Mot.); Defendant–Intervenor RS Information Systems, Inc.'s Opposition to Plaintiff's Application for Temporary Restraining Order, Motion for Preliminary Injunction, Permanent Injunction and Declaratory Judgment (RSIS's Opp.); Transcript of Oral Argument on November 27, 2001 (Oral Arg. Tr.); Plaintiff's Consolidated Reply (Pl.'s Cons.Rep.); Defendant's Reply Brief (Def.'s Reply); and Defendant–Intervenor RS Information Systems, Inc.'s Reply Brief (RSIS's Reply).

II. Discussion

A. Standard of Review

1. Motion for Judgment on the Administrative Record

Motions for judgment on the administrative record are governed by the same rules

---

12. The Cost Team also performed a Most Probable Cost analysis for the third offeror's proposal. AR at 2165.

13. ITAC filed a supplemental bid protest at the GAO on August 27, 2001. Def.'s Facts ¶ 22.

as motions for summary judgment. Rule of the United States Court of Federal Claims (RCFC) 56.1(a); *see Nickerson v. United States,* 35 Fed.Cl. 581, 588 (Fed.Cl.1996), *aff'd,* 113 F.3d 1255 (Fed.Cir.1997). Summary judgment is warranted when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact that might significantly affect the outcome of the litigation is material. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The question on a motion for judgment on the administrative record is "whether the record substantiates a preponderance of evidence to uphold the procurement decision." *Ellsworth Assocs., Inc. v. United States,* 45 Fed.Cl. 388, 393 (Fed.Cl. 1999). It is appropriate to assess a procurement through summary judgment motions and motions for judgment on the administrative record "because the issues are matters of contractual and regulatory interpretation . . . ." *Analytical & Research Tech., Inc. v. United States,* 39 Fed.Cl. 34, 43 (Fed.Cl. 1997).

Defendant has filed a motion for summary judgment on the administrative record in response to plaintiff's requests for injunctive relief. Because plaintiff must show that it is likely to prevail on the merits to be granted injunctive relief, *see DSD Labs., Inc. v. United States,* 46 Fed.Cl. 467, 480 (Fed.Cl.2000), the court addresses the merits of the case first.

2. Protest of an Agency's Procurement Decision

█ In a bid protest action, the court reviews defendant's source selection decision under the standards set out in the Administrative Procedure Act (APA), 5 U.S.C. § 706. 28 U.S.C. § 1491(b)(4). The APA directs a reviewing court to overturn agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or, alternatively, "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). The protestor must show, by a preponderance of the evidence, that the

agency's actions were either without a reasonable basis or in violation of applicable procurement law. *GraphicData, LLC v. United States,* 37 Fed.Cl. 771, 779 (Fed.Cl. 1997).

█ In addition to showing that the agency's action was arbitrary or capricious or otherwise inconsistent with law, a plaintiff in a bid protest action must show that the action was prejudicial. *See* 28 U.S.C. § 1491(b)(4); 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."); *Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996) ("[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it."). To show prejudice, the protestor must demonstrate that there is a reasonable likelihood that, absent the error or violation of law, it would have been awarded the contract. *Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (Fed.Cir.1999). The agency is entitled to broad discretion in evaluating proposals in a "best value" procurement, such as the one at issue here. *See CACI Field Servs., Inc. v. United States,* 13 Cl.Ct. 718, 725 (1987), *aff'd,* 854 F.2d 464 (Fed.Cir. 1988). A court "should not substitute its judgment . . . for that of the agency, but should intervene only when it is clearly determined that the agency's determinations were irrational or unreasonable." *Baird Corp. v. United States,* 1 Cl.Ct. 662, 664 (1983). If defendant shows that there was a reasoned basis for its decision, the award must be upheld. *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974); *CRC Marine Servs., Inc. v. United States,* 41 Fed.Cl. 66, 83 (Fed.Cl.1998). Accordingly, the court reviews defendant's decision to determine whether there was a rational basis for its evaluation and whether the evaluation was consistent with applicable law. If the court finds error, the court then examines whether the error was prejudicial to plaintiff.

B. Insufficient Evidence of Agency Bias against ITAC

Plaintiff alleges that in contravention of the RFP and Federal Acquisition Regulation

(FAR) 15.306(e)(1),[14] the Air Force "acted to favor [the] other offerors ... and [showed] bias against ITAC." Pl.'s Mem. at 32. As evidence of the alleged bias, plaintiff points to the Air Force's response to certain written questions prepared by ITAC inquiring, after the award decision, about the source selection process. *See* AR at 67–78. In particular, ITAC posed several questions asking why the disparity between the government's Independent Cost Estimate and ITAC's estimate for the Core Task Order Scenario was not investigated further.[15] Pl.'s Mem. at 32–33. To each of the questions the Air Force responded that a determination was made that "discussions would not change the decision to award to RSIS." AR at 76, 77, 78.

As additional evidence of bias against it, ITAC points to statements made by the Air Force during the debriefing with ITAC. ITAC specifically complains that during the cost "evaluation" slide shown by the SSA, the Air Force claimed that it was unable to perform a Most Probable Cost analysis for ITAC's proposal but indicated that it made adjustments to the proposals of the other offerors in order to evaluate them.[16] Pl.'s Mem. at 33. *See* AR at 2165, 2232. ITAC argues that the Air Force's failure to make similar adjustments to ITAC's proposal effectively "eliminated [it] from the competition." Pl.'s Mem. at 34.

The government asserts that the gravamen of ITAC's bias allegation is that the government failed to conduct discussions with ITAC to understand the basis for ITAC's modest cost estimate for the Core Task Order. *See* Def.'s Opp. and Mot. at 31–32. The government states, "ITAC may believe that discussions would have allowed it to correct its weaknesses, but ITAC was responsible for submitting a technically superior offer in this best value procurement, and could not count on the fact that discussions would be held." *Id.* at 32.

The court agrees. ITAC's allegations of bias center on the Air Force's decision not to elicit additional information from ITAC about its proposal with respect to the Core Task Order Estimate. The court more fully addresses ITAC's particular allegations regarding the Air Force's failure to conduct discussions with ITAC and the Air Force's flawed evaluation of ITAC's Core Task Order cost in parts II.E and II.F below. Nonetheless, the court briefly observes here that the RFP specifically advised that an offeror "should ... explain[ ]" any inconsistency in the proposal between promised performance and cost/price. AR at 163. The RFP expressly assigned the burden of proof as to cost credibility and realism to the offeror. *Id.* Additionally, the terms of the RFP make clear that the Air Force reserved the right to award the contract without conducting discussion with the offerors. AR at 135.

■■■ The law is well established that government officials are presumed to act in good faith in the discharge of their duties. *See Spezzaferro v. Fed. Aviation Admin.*, 807 F.2d 169, 173 (Fed.Cir.1986); *Kalvar Corp. v. United States*, 211 Ct.Cl. 192, 543 F.2d 1298, 1301–02 (1976). "[I]t requires 'well-nigh irrefragable proof' to induce the court to abandon the presumption of good faith fair dealing," *Kalvar*, 543 F.2d at 1301–02. To meet that burden of proof, a plaintiff must demonstrate "some specific intent to injure plaintiff." *Id.* at 1302. *See also Asco–Falcon v. United States*, 32 Fed.Cl. 595, 604 (Fed.Cl.1994) (stating that "plaintiffs must allege and prove by clear and strong evidence, specific acts of bad faith on the part of the government"); *Libertatia Assoc., Inc. v.*

---

14. Section 15.306(e)(1) of the FAR prohibits government personnel involved in an acquisition from "engag[ing] in conduct that [f]avors one offeror over another." FAR 15.306(e)(1).

15. *See* AR at 76 ("Why was an EN not issued to ask ITAC Alliance to explain their rationale [for the efficient time and cost estimates for the Core Task Order]"); AR at 77 ("With such a great disparity between the government's cost estimate and ITAC's ..., [w]hy ... didn't ITAC receive an evaluation notice to clarify our basis of esti-

mate?"); AR at 78 ("Why didn't the government ask us to rectify significant differences between our estimates and theirs?").

16. The Air Force [ ] for the Core Task Order proposed by [ ] after determining "that [ ]." AR at 2165. No [ ] adjustment was made for ITAC's proposal, however, because the Air Force found that the proposed hours were so minimal and so out of line that a most probable cost analysis was not feasible. *Id.*

*United States,* 46 Fed.Cl. 702, 711 (Fed.Cl. 2000) (finding agency official acted with ill will toward plaintiff and manifested specific intent to injure).

■ ITAC does not allege and the record does not reveal that the Air Force had a specific intent to injure ITAC. Nor has ITAC established it claim that the Air Force acted with bias toward it. Rather, the court finds that the Air Force adhered to the terms of the RFP in declining to seek further information from ITAC regarding its proposed cost estimate for the Core Task Order subfactor of its technical proposal.

### C. Agency did not Improperly Weight Three Technical Subfactors

ITAC asserts that, contrary to the terms of the RFP, the Air Force gave greater weight to three elements "arguably contained" in the Mission Capability subfactors. Pl.'s Mem. at 9. ITAC complains that during the Air Force debriefing on July 27, 2001, the Air Force first identified three "overarching requirements" of cross-utilization, integration, and innovation. Pl.'s Mem. at 10; AR at 2188. ITAC contends that these elements "were used to enhance RSIS's scores, to diminish ITAC's scores, and were singled out from all the other 'Mission Capability' elements in the presentation to the Source Selection Authority as one of the principal bases for the recommended award to RSIS." Pl.'s Mem. at 14.

Defendant argues that the elements of cross-utilization, integration, and innovation "were discussed throughout the solicitation, and are present under each Mission Capability subfactor." Def.'s Opp. and Mot. at 9. Defendant explains that the "three concepts were described as 'overarching requirements' not because they were secret evaluation criteria, but because they succinctly captured the vision of the TSSOS effort." *Id.* at 9–10.

■ The law requires that evaluation factors and significant subfactors are to be clearly stated within a RFP, including a statement of the relative importance of such factors and subfactors. 10 U.S.C. § 2305a(2)(A) (1994); FAR § 15.304(d); *Analytical Research Tech., Inc. v. United*

*States,* 39 Fed.Cl. 34, 44 (Fed.Cl.1997), *Lloyd H. Kessler, Inc.,* 2000 WL 745317, *3 (Comp. Gen. May 24, 2000). A procuring agency may evaluate proposals only on the basis of the factors identified and their stated relative importance. *Canadian Commercial Corp./Polaris Inflatable Boats (Canada), Ltd.,* 1997 WL 470879, *2 (Comp.Gen. Jul. 31, 1997).

■ Examining the RFP in this case, the court finds that the concept of an integrated and streamlined approach to technical support services was stated unambiguously in the solicitation. The solicitation's Statement of Work emphasizes the importance of these concepts in its introductory narrative describing the challenges of the Space Warfare Center stating:

> Key goals of the [Space Warfare Center] requiring contractor support are to create a team environment between Industry and Government to accomplish the mission, minimize or eliminate independent stove-pipes within the organization, develop or identify opportunities for cross-utilization of resources and/or personnel, and the flexibility/responsiveness to redirect activities or focus resources to resolve critical situations/issues as necessary.

AR at 176. The identified goal of "minimiz[ing] or eliminat[ing] independent stove-pipes" reflects an interest in integration. The goal of cross-utilization is explicit, and the goals of "develop[ing] or identify[ing] opportunities for cross-utilization" and achieving "flexibility /responsiveness to redirect activities" both invite an offeror to propose innovative approaches to accomplishing the contract effort.

The court also finds that the elements of cross-utilization, integration, and innovation were present within each of the four equally-weighted subfactors. *See* AR at 159 (RFP states that "[a]ll subfactors are of equal importance"), 161–162. For each subfactor, the RFP states that "[t]he Government may consider *innovations* and enhancements that are beneficial to or exceed or improve the [outlined] performance requirements . . . if they are evaluated to be strengths." *Id.* at 161, 162 (emphasis added). For subfactors A, C, and D, the RFP states that the Air Force may consider, if evaluated as a proposal

strength, "an [o]fferor's *creativity*, ability, methodology, or approach to integrate, leverage, and/or exploit emerging space based technologies, concepts, products, tactics, doctrine, and lessons learned to enhance combat capability, *eliminate or minimize stovepiping*, and/or integrate space into warfighting." *Id.* at 161 (emphasis added).

Under subfactor A, Program Management and Integration, the RFP states that the Air Force "will evaluate the Offeror's flexibility, responsiveness, and cross-utilization of personnel to manage tasks and obtain synergies as part of an integrated SWC mission." *Id.* at 161. The RFP also states that the Air Force may consider, if evaluated as a proposal strength, an "[o]fferor's innovative approach to respond to contingency requirements." *Id.* at 161.

Under subfactor B, Management/Maintenance of Information Systems, Computer Networks, and Databases for Internal/External S[pace] W[arfare] Center Communications, the RFP states that "the Government will evaluate the proposed skill mix to include cross utilization and the Offeror's approach to responding to communications/computer contingencies." *Id.* The RFP also states that the Air Force may consider, if evaluated as a proposal strength, "[a] process or strategy to utilize, integrate and/or replace existing hardware and software that improves the operational efficiency, reliability, maintainability, and/or availability of systems/networks/databases at a reduced life cycle cost." *Id.* at 162. Similarly, the Air Force may consider an offeror's "approach to enhance or improve the efficiency of information systems and network operations and maintenance functions." *Id.*

For both subfactor C, the written Core Task Order Scenario, and subfactor D, the oral 72 Hour Contingency Task Order, the RFP states that the Air Force will "evaluate the Offerors' approach to offer better solutions, alternatives, and options to help the Government improve on [the identified] ... tasks." *Id.* at 162.

The foregoing analysis of the evaluation criteria within each of the technical subfactors supports defendant's view that the "three concepts were described as 'overarch-

ing requirements' not because they were secret evaluation criteria, but because they succinctly captured the vision of the TSSOS effort." Def.'s Mot. and Opp. at 9–10.

Moreover, the court also finds in the record ample explanation of the evaluation by the agency of the four Mission Capability subfactors in each proposal and of the scores assigned to each offeror's proposal for the four Mission Capability subfactors.

For subfactor A, [ ] ITAC [ ] received [a] green ratin[g] and [a] moderate risk assessmen[t]. *See* AR at 2176. Although the Air Force assigned a[ ]. Def.'s Opp. and Mot. at 13. *See* AR at 2159.

For subfactor B, ITAC received a green rating and a moderate risk assessment. AR at 2172. The Air Force identified ITAC's failure to propose a methodology for cross-utilizing its employees under the subfactor as a weakness. *Id.* at 2141. For subfactor B, RSIS received a[ ] rating of [ ] and a[ ] risk assessment. *Id.* at 2172. The [ ] identified [ ] for RSIS under this subfactor were [ ]. *Id.* at 2160–2161.

For subfactor C, [ ] ITAC [ ] received [a] green ratin[g]. *Id.* at 2174. ITAC received a high risk assessment with the Air Force noting as a weakness ITAC's "unreasonable schedule and labor hours." *Id.* RSIS received a[ ] risk assessment with the Air Force noting as a[ ] the [ ] in RSIS's proposal. *Id.*

For subfactor D, ITAC received a green rating and was assessed a moderate risk. *Id.* at 2175. The noted weakness in ITAC's proposal was "[u]nrealistic labor hours" based on the Air Force's independent cost estimate for the contingency scenario. *Id.* RSIS received a[ ] rating and was assessed a[ ] risk. *Id.* Among the noted [ ] in RSIS's proposal were [ ]. *Id.*

While ITAC may disagree with the Air Force's assessment of its proposal, the court's review of this bid protest action is limited to an examination of the agency's evaluation for consistency with the applicable law and the evaluation criteria set forth in the solicitation. *See Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S.

at 285–86, 95 S.Ct. 438 (1974); *CACI Field Servs., Inc.*, 13 Cl.Ct. at 725; *CRC Marine Servs., Inc.*, 41 Fed.Cl. at 83. The case law is clear that an agency is afforded broad discretion in evaluating the relative merit of competing proposals. *See E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed.Cir. 1996); *ACRA, Inc. v. United States*, 44 Fed. Cl. 288, 294 n. 10 (Fed.Cl.1999); *Hydro Eng'g Inc. v. United States*, 37 Fed.Cl. 448, 467 (Fed.Cl.1997). The record here reflects that the agency evaluated the Mission Capability subfactors of the offerors' proposals giving consideration, in accordance with the terms of the RFP, to those proposed innovations and enhancements that it deemed to be strengths. Based on the evaluation criteria outlined in the RFP and the agency's explanation for its scoring of each subfactor, the court cannot find that the Air Force improperly weighted three elements of the Mission Capability subfactors. *See OAO Corp. v. United States*, 49 Fed.Cl. 478, 483–84 (Fed. Cl.2001).

### D. Past Performance Evaluation of RSIS not Unreasonable

██ ITAC asserts that the Air Force's "high confidence" rating of the Past Performance factor of RSIS's proposal was irrational because RSIS's proposal "showed the enormous weakness of a prime contractor that had no past performance related to space warfare leading a team of over a dozen subcontractors some of which did." Pl.'s Mem. at 15; AR at 2176. ITAC argues that RSIS's past experience is limited to "providing information technology services." Pl.'s Mem. at 15. ITAC further argues that, contrary to law, the Air Force's confidence rating does not reflect a proper evaluation of RSIS's own past performance but disproportionately reflects the past experience of the subcontractors proposed by RSIS to perform 75% of the work. Pl.'s Mem at 21–23. Contrasting the alleged weakness of RSIS's past performance with ITAC's past performance strength as the incumbent contractor "having direct performance experience with the work to be done under the TSSOS contract," ITAC argues that the Air Force's decision to give both ITAC and RSIS equal past performance ratings was not rationally-based. *Id.*

Defendant contends that not only did RSIS have relevant past performance experience, RSIS also had highly rated evaluations for its performance in those relevant contracts. *See* Def.'s Opp. and Mot. at 15–20. Defendant argues that it did not act improperly by considering the past performance evaluations of RSIS's subcontractors when evaluating RSIS's proposal. Def.'s Reply at 15–16.

RSIS argues that, contrary to ITAC's allegations, it is not a "mere IT integrator." RSIS's Opp. at 5. Explaining that it "proposed itself as the 'Lead' on those Statement of Work tasks that involved its strengths in systems integration and management, and as 'Support' on other tasks," *id.*, RSIS refutes ITAC's assertion that it claimed "no" relevant past performance for many of the technical work tasks, *see* Pl's Mem. at 19, and points out that it submitted relevant past performance information for itself for those non-IT tasks it proposed to support. *Id.* RSIS adds that the Air Force properly considered the past experience of RSIS's proposed subcontractors because the terms of the RFP "explicitly notified the offerors of [the Air Force's] intention to include subcontractors in its Past Performance assessment." *Id.* at 4. RSIS states "that where, as here, offerors are exempt from the small business affiliation rules because of the size of the procurement (*see* 13 C.F.R. [§] 121.103(f)(3)(i)(B)(2)), it is the small business 'team'—the individual small business submitting the proposal—that is to perform 50% of the work. *See* 13 C.F.R. § 125.6(g)." RSIS's Opp. at 12.

Section M of the RFP specified how the Air Force would evaluate Past Performance. AR at 160. The RFP stated that a Performance Risk Assessment Group (PRAG) would evaluate each offeror's past performance and determine a confidence rating. *Id.* The confidence ratings were taken from and defined in AFFARS 5315.305(a)(2). *Id.*

The RFP directed offerors to "submit relevant Past/Present performance information for themselves and for each proposed critical subcontractor, teaming contractor, and/or joint venture partner, that it considers relevant in demonstrating the ability to perform

the proposed effort." *Id.* at 142. The RFP advised offerors that the PRAG would "evaluate relevant past and present performance to assess confidence in each offeror team's ability to perform the requirements of the solicitation." [17] *Id.* at 160.

For evaluation of the past performance portion of its proposal, RSIS submitted eight contracts totaling $197.3 million for itself, and thirty-three contracts for its proposed subcontractors. AR at 2154–2156. The RSIS team included sixteen subcontractors. *Id.* at 2156–2158.

The record reflects that, as part of its past performance evaluation, the government prepared a Past Performance Spreadsheet for RSIS. *See* AR at 560–570. The spreadsheet matched each of the management/technical tasks identified in the Statement of Work for the TSSOS contract,[18] *see id.* at 172, 183–243, to past contract work performed by RSIS itself as well as to past contract work performed by each of RSIS's proposed subcon-

tractors. *Id.* at 560–570. The spreadsheet indicates that RSIS itself possessed specific performance experience for twelve of the fifteen mechanical/technical tasks defined in the Statement of Work. *Id.* at 560–561. While RSIS lacked past performance experience for three of the defined management/technical tasks,[19] the spreadsheet reflects that the past performance experience of at least ten of RSIS's proposed subcontractors correlated to the three management/technical tasks for which RSIS itself lacked past performance experience. *Id.* at 561–566. The portion of the Statement of Work addressing the mechanical/technical tasks to be performed under the TSSOS contract explicitly stated that "[a]ny bidding prime contractor or prime with associated subcontractors must be capable of performing all required SOW tasks." *Id.* at 183.

Notwithstanding the PRAG's documented conclusions, ITAC contends that the responses to the past performance questionnaires

17. By the RFP's terms:
 More recent and relevant performance will have a greater impact on the Performance Confidence Assessment than less recent or relevant effort. A strong record of relevant past performance may be considered more advantageous to the Government than an "Unknown Confidence" rating. Likewise, a more relevant past performance rating may receive a higher confidence rating and be considered more favorably than a less relevant record of favorable performance.
 AR at 160. For offerors who lacked a relevant past performance record, the RFP stated:
 Offerors without a record of relevant past performance or for whom information on past performance is not available will not be evaluated favorably or unfavorably on past performance and, as a result, will receive an "Unknown Confidence" rating for the Past Performance factor.
 *Id.*

18. The Statement of Work listed sixteen Management/Technical tasks:
 3.1 Support to Program Management and Integration
 3.2 Requirements Analysis and Technical Support to SWC
 3.3 Development of Space Warfare Concepts of Operations (CONOPS) and Tactics, Techniques, and Procedures (TTPs) for Current and Future Space Systems
 3.4 Modeling, Simulation, and Analysis
 3.5 Education, Training, and Aerospace Course Development and Administration
 3.6 Missile Defense Activities

 3.7 Evaluation, Technical Assessment, & User Utility Demonstrations of Advanced Technology Concepts, Prototypes, and Developing Systems
 3.8 Technical Support to Planning and Execution of Test and Evaluation
 3.9 Support to Exercises, Wargames, and Experiments
 3.10 Support to Real World Contingencies
 3.11 Intelligence Support
 3.12 Development and Maintenance of Information Systems, Databases, Computer Networks and Web–Sites for Internal/External SWC Communications
 3.13 Integration of Space Systems into Command and Control Architectures
 3.14 Support to SWC Geographically Separated Units (GSU) Organizations
 3.15 Support, Planning, and Set-up of SWC Conferences and Meetings
 3.16 Additional Support Tasks
 AR at 172, 183–243. The Past Performance Spreadsheet excluded task 3.16 "Additional Support Tasks," for the reason, the court assumes, that task 3.16 is derivative of other support tasks.

19. Specifically, RSIS lacked past performance experience for the defined management/technical tasks of: (3.9) Support to Exercises, Wargames, and Experiments; (3.10) Support to Real World Contingencies; and (3.13) Integration of Space Systems into Command and Control Architectures. AR at 560–561.

submitted to the Air Force on behalf of RSIS and contained in the administrative record show that RSIS lacked past experience in all task areas but the management and mainte- nance of information systems, which ITAC concedes "is RSIS's core business." Pl.'s Mem. at 20. ITAC insists that RSIS cannot receive "the highest past performance rating when they have no relevant experience and they—not their subcontractors—will be per- forming 25% of the work." *Id.* at 21. In support of its argument, ITAC cites several decisions by the Comptroller General ad- dressing the past performance of a proposed subcontractor.[20]

It is the court's view that the cited deci- sions do not assist ITAC's arguments in this case.[21] In *Oceanometrics, Inc.,* 1998 WL 309917, at *4 (Comp.Gen. June 9, 1998), the Comptroller General found that an agency may consider the past performance of a pro- posed subcontractor if it is reasonably pre- dictive of the offeror's performance under the contract. If the proposed subcontractor is not to be involved in "a major or critical aspect of the contract," however, that sub- contractor's past performance is of limited relevance. *Id.* Focusing on the percentage of work proposed to be accomplished by each of RSIS's subcontractors, ITAC argues that the Air Force has improperly relied on the past performance of subcontractors, that, respec- tively, would not be performing a significant portion of the contract work.[22] Pl.'s Mem. at 22–23. But the law, the terms of the RFP, and the administrative record support a dif- ferent conclusion.

While the Comptroller General in *Oceano- metrics* does not define what constitutes a "major or critical aspect" of a contract, it is

the court's view that the percentage of the work proposed to be performed is one con- sideration and not the dispositive factor in determining whether the proposed effort of the subcontractor is a major or critical aspect of the work. *See, e.g., Strategic Resources, Inc.,* 2001 WL 867984, *4 (June 18, 2001) (finding that the percentage of work per- formed by a proposed subcontractor on past contracts was properly considered and weighted in agency's evaluation of "reason- ably predictive" indicators of offeror's pro- spective contract performance). In this case, the portion of the Statement of Work that outlines the technical aspects of the TSSOS contract indicates that "[a]ny bidding prime contractor ... with associated subcontractors must be capable of performing all required SOW tasks." AR at 183. Moreover, the RFP makes clear that the Air Force will consider past performance information "for each proposed critical subcontractor, teaming contractor, and/or joint venture partner, that it considers relevant in demonstrating the ability to perform the proposed effort[,]" *id.* at 142, and that it will evaluate "each offeror team's ability to perform to the requirements of this solicitation." *Id.* at 160. The terms of the RFP expressly contemplate evaluating the past performance of an offeror team, a team comprised of a contractor and any num- ber of subcontractors, and the law permits such consideration. The administrative rec- ord reflects that the Air Force considered the past performance experience of RSIS together with its proposed subcontractors and found its past performance relevant and highly rated. Based on the law, the RFP, and the support for the agency's decision in

**20.** While the decisions of the GAO do not bind this court, the reasoning of the Comptroller Gen- eral provides useful guidance to the court. *See Planning Research Corp. v. United States,* 971 F.2d 736, 740 (Fed.Cir.1992); *Honeywell, Inc. v. United States,* 870 F.2d 644, 647–49 (Fed.Cir. 1989).

**21.** In *Innovative Technology Systems, Inc.,* 1995 WL 317615 (Comp.Gen. May 24, 1995), the Comptroller General found that in evaluating the past performance factor of a proposal, the agen- cy properly limited its consideration of the past experience of the proposed subcontractors to 50 percent of the past performance factor because FAR 52.219–14, which was incorporated by ref-

erence into the solicitation, required an offeror to expend at least 50 percent of the proposed labor costs under the contract for its own em- ployees. *Id.* at **4–6. No such percentage per- formance requirement exists for the offerors in this case.

**22.** RSIS proposed to complete [ ] of the contract work. AR at 2154. Four of the proposed subcon- tractors would perform, respectively, approxi- mately [ ] of the contract work. *Id.* at 2154– 2156. The remaining subcontractors would per- form, respectively, [ ] or less of the proposed work. *Id.*

the administrative record, the court does not find that the agency acted improperly in considering the past performance evaluations of RSIS's subcontractors when evaluating RSIS's proposal and assigning a high confidence past performance rating to RSIS.

### E. Agency did not Conduct Discussions

■ According to plaintiff's Complaint, the Air Force conducted "[discussions]" [23] with RSIS, but "failed to do so with ITAC." Complaint ¶ 29. As plaintiff concluded after oral argument, "It is patently unfair, and a violation of law and regulation, for the Air Force, as they did here, to engage in discussions with RSIS regarding the weaknesses and deficiencies in RSIS's past performance part of its proposal, and then hide from ITAC the perceived weakness and deficiencies in other portions of ITAC's proposal." Pl.'s Cons.Rep. at 15.[24]

Of the greatest concern to ITAC are several evaluation notices (ENs) issued to RSIS at the beginning of May, 2001 after all offerors had submitted past performance information, but before the due date for other parts of the proposals. These ENs were among five ENs directed to RSIS and three ENs directed to ITAC. AR at 499–544. According to ITAC, the ENs constituted "discussions" within the meaning of FAR 15.306(d) because the ENs revealed deficiencies to RSIS in the past performance aspect of its proposal and provided RSIS an opportunity to correct the deficiencies by changing its proposal. See Pl.'s Mem. at 30; see also Pl.'s Cons.Rep. at 11–13. Discussions generally lead to an opportunity for all offerors within the competitive range to revise their proposals. FAR 15.307.

The RSIS ENs (Control Nos. 0001, 0002, 0002A) and a similar EN concerning past performance issued to ITAC (Control No. 0001) all contain two indications that they are not to be regarded as communications in the nature of "discussions." Each EN is on a form which contains at the top of the page a list—with a line next to each item where a check mark may be placed—of possible types of communications including, of particular relevance here, "FAR 15.306(a) Clarification" and "FAR 15.306(c) Discussions." In this case, each of the forms contains an "X" next to words "FAR 15.306(a) Clarification." AR at 499, 510, 519, 537. The text of each of the ENs also states that the EN does not constitute discussions. Three of the ENs conclude with the following sentence, "Please note that this clarification does not constitute oral discussions with the offeror." AR at 499, 511, 537. One of the RSIS ENs contains a variant of that language to the same effect. "Please note that this EN does not constitute discussions with the Offeror." AR at 519.

Plaintiff argues that an agency's characterization of its actions as "clarifications" is not determinative, citing *Dubinsky v. United States*, 43 Fed.Cl. 243, 262 (Fed.Cl.1999). While the court agrees with the general point, the *Dubinsky* case involved additional exchanges occurring after discussions had in fact been conducted. *Id.* Here, the agency issued a proposal reserving its right to make an award without discussions, as it was entitled to do under the FAR. AR at 135; FAR 15.306(a)(3) (award may be made without discussions if the solicitation so states). It is difficult to see what more the agency could have done to make it clear to RSIS and ITAC that the questions the agency was asking about past performance were not intended by the agency to be discussions.

Of more direct relevance to this procurement is *Firearms Training Sys., Inc. v.*

---

23. The word appearing in the Complaint is "negotiations," but the entire subsequent briefing of the issue makes clear that plaintiff's issue is in fact "discussions."

24. Plaintiff makes more specific its argument of unfairness, stating, "In the case of RSIS, the Air Force determined it did not have enough information to evaluate RSIS on past performance. What did it do? It went to RSIS and asked for the additional information. In the case of ITAC, the Air Force determined it did not have enough information to price the core task order or evaluate the reduced labor hours or labor categories proposed by ITAC as compared to its ICE. What did it do? It simply downgraded ITAC and refused to price ITAC's core task order, all but eliminating ITAC from the competition. This is exactly what the regulations and cases are intended to prevent." Pl.'s Cons.Rep. at 15. The second part of plaintiff's argument relating to defendant's handling of the evaluation of ITAC's core task order is addressed in part II.F below.

*U.S.*, 41 Fed.Cl. 743 (Fed.Cl.1998), a case which examines the actions of an agency where the alleged failure to conduct discussions occurred in a procurement in which the contracting entity "did not intend to allow offerors to revise their proposals, to enter discussions under FAR 15.306(d), or to make a competitive range determination," all circumstances which are present in this case. *Firearms Training* at 746. As that court noted, the FAR contemplates the possibility of "discussions" after a competitive range determination has been made. *See id.* at 746.

As RSIS argues, citing *Firearms Training*, "The context in which an information exchange takes place is important in establishing whether it is a clarification or a discussion." RSIS's Reply at 7. When Part 15 of the FAR was rewritten in 1996 and 1997, one of the purposes of the drafters was to provide a bright line test for "clearly defining when discussions begin." *Id.* (quoting Federal Acquisition Circular (FAC) 97–02 comment (g)(2), 62 Fed.Reg. 51229 (1997)). Another purpose of the FAR Part 15 rewrite, argued by defendant, Def.'s Reply at 5, was to increase the flow of information. "We drafted the rule [FAR 15.306] to allow as much free exchange of information between offerors and the Government as possible, while still permitting award without discussions ...." 62 Fed.Reg. 51228–29.

ITAC's argument appears to be that whatever leeway was afforded by the FAR Part 15 rewrite, it was abused in this case because the offerors were invited to respond to the ENs with "additional" information, rather than "clarifications"[25] within the definition of FAR 15.306(a). Pl.'s Cons.Rep. at 13. The court agrees that the text of the broadest of the ENs to RSIS, Control No. 2002, AR at 510, by its terms seeks "additional" information. The court does not, however, agree that the fact that additional information about past performance was requested of RSIS requires the court to conclude either that discussions were in fact conducted or that the procurement was otherwise illegal or prejudicially unfair to ITAC.

On the question of fairness and prejudice, the record shows that a parallel, although less detailed, request was made of ITAC by Control No. 0001. AR at 537. Both ITAC and RSIS responded immediately with factual information relating to the past performance of members of their teams (as to RSIS) and statements concerning whether team members were expected to play lead or support roles in various aspects of the contract performance (as to both ITAC and RSIS). AR at 513–530 (RSIS), 538–539 (ITAC). The record contains no hint that ITAC was misled in any way into thinking that discussions had been commenced. Instead, the record amply supports the conclusion that RSIS and ITAC were treated evenhandedly in this matter.

On the question of illegality, the court does not find a "significant" error in the procurement attributable to the violation of a law or regulation. *See Data Gen. Corp.*, 78 F.3d at 1562. Even if the request for additional information contained in EN Control No. 2002 to RSIS were outside the scope of a strict construction of FAR 15.306(a) (a point that is not clear to the court), the agency would still have been afforded a wider (and yet still pre-discussion) scope of inquiry by FAR 15.306(b) governing "communications." That provision, which assists the Government in establishing the competitive range, states that "communications" are required to be held "with offerors whose past performance information is the determining factor preventing them from being placed within the competitive range." FAR 15.306(b)(1)(i). FAR 15.306(b)(3) states that "communications" are provided "for the purpose of addressing issues that must be explored to determine whether a proposal should be in the competitive range. Such communications shall not provide an opportunity for the offeror to revise its proposal, but may address ...[i]nformation relating to relevant past

---

**25.** FAR 15.306 regarding clarifications provides, "Clarifications are limited exchanges ...." FAR 15.306(a)(1). The next subsection expands on that observation by noting that, when award without discussions is anticipated, "offerors may be given the opportunity to clarify certain aspects of proposals (e.g., the relevance of an offeror's past performance information and adverse past performance information to which the offeror has not previously had an opportunity to respond) or to resolve minor or clerical errors." FAR 15.306(a)(2).

performance ...." The exchanges that plaintiff complains of here fall more comfortably within the definition of communications. The agency does not leap to embrace that characterization, not only because the characterization conflicts with the characterization of the ENs as "clarifications" on the EN forms, but also because the guidance on "communications" is addressed to the establishment of a competitive range, a procurement step that the agency did not take here and would generally not take unless discussions were expected to be held. The government candidly notes, however, that, if not clarifications, "the exchanges ... in this protest are most similar to communications ...." Def.'s Reply at 6. The exchanges were not, in any event, discussions. Even if the exchanges did not fit neatly into either the clarifications or communications pigeonholes, they were not unfair as between ITAC and RSIS. The ENs did not constitute a significant error in the procurement process entitling plaintiff to relief.

F. Cost Evaluation of ITAC's Task Order Proposal not Unreasonable

 ITAC contends that the high risk rating it received for the Core Task Order subfactor of its technical proposal was based on a "wildly inaccurate" independent cost estimate performed by the government and was therefore irrational. Pl.'s Mem. at 24. ITAC states that the Air Force's high risk rating for that subfactor "ignored a fundamental strength of the ITAC proposal which met a specific government desire to minimize cost by using 'off-the-shelf' solutions." *Id.* ITAC asserts that, based on the government's failure to evaluate "off-the-shelf solu-

tions" to "take advantage of the Iridium telecommunications architecture/system," a stated objective of the Core Task Order Scenario, the Air Force derived and relied upon an erroneous independent cost estimate in evaluating ITAC's proposal. *Id.* at 24 (citing the Core Task Order).

In support of its allegations, ITAC supplements the administrative record with the affidavit of Donald L. Jewell.[26] In his affidavit, Mr. Jewell states that "after having familiarized [himself] with both the ITAC proposal and the requirements of the 'Core Task Order' scenario in the ... TSSOS ... RFP," he has reviewed the ITAC final proposal and finds the Core Task Order cost and schedule reasonable and realistic because it takes advantage of the cost and manpower savings attainable using off-the-shelf Motorola materials relating to Iridium to accomplish certain tasks. *See* Jewell Aff. at 1–2.

Defendant contends that the government's independent cost estimate was rational. Def.'s Opp. and Mot. at 20; Def.'s Reply at 7. Defendant explains that while ITAC's proposed methodology satisfied the minimum requirements of the Core Task Order, ITAC's proposal was deficient in both labor hours and labor mix. Def.'s Opp. and Mot. at 20, 22.

The Core Task Order Scenario, subfactor C of the Mission Capability factor, asks offerors to develop a solution for conveying imagery to remotely located troops utilizing the Iridium satellite system.[27] AR at 2127. The RFP separates the Core Task Order Scenario into seven tasks.[28] *Id.* at 268–273. The RFP directs the offerors to develop a Task Order Management Plan outlining the

**26.** The court granted Plaintiff's Motion to Supplement the Administrative Record with the affidavit of Donald L. Jewell during oral argument. *See* Oral Arg. Tr. at 59, 95. Mr. Jewell is the Director of General Dynamics Decision Systems, Inc., which recently purchased Motorola Integrated Systems Group. Affidavit of Donald L. Jewell (Jewell Aff.) at 1. Formerly on active duty with the Air Force as the Deputy Chief Scientist of the Air Force Space Command, Mr. Jewell participated in tracking the development of the Motorola Iridium System for the Air Force Space Command and is currently the "resident Iridium expert in Colorado Springs, Co." *Id.*

**27.** Iridium is a satellite-based commercial communications service providing digital voice, data, paging and facsimile to users equipped with small terminals. *See* RSIS's Opp. at 16.

**28.** The seven subtasks identified in the Core Task Order are: (1) Development of a Concept of Operations (CONOPS), (2) Analysis of CONOPS, (3) Evaluation of Off–the–Shelf Solutions/Alternatives, (4) Integration/Implementation of Off–the–Shelf Components, (5) Develop and Conduct Training, (6) Demonstrate the Capability, and (7) Transition Planning and Support. AR at 269–272.

offerors' approach to planning, managing, scheduling, and executing the seven identified subtasks during a twelve-month period of performance. *Id.* at 269–273, 2127. The RFP alerts offerors that the "government will evaluate the Offeror's mix of qualified and knowledgeable personnel, and labor hours with respect to realism and reasonableness." *Id.* at 162. The RFP specifically advises that the government's realism evaluation would "assess the compatibility of the overall proposed costs with the scope of effort to be performed." *Id.* at 163. The RFP states that an offeror "should … explain[ ]" any inconsistency in the proposal, whether real or apparent, between the promised performance and cost or price. *Id.* The terms of the RFP make clear that the burden of proof as to cost credibility and realism rests with the offeror. *Id.*

Consistent with the regulatory guidance regarding the use of a Federally Funded Research and Development Center,[29] the government engaged Aerospace Corporation, a Federally Funded Research and Development Center, to develop an independent cost estimate based on the same oral and written task orders provided to the offerors. *See* AR at 2386; Def.'s Reply at 7–8. The Aerospace Corporation was involved in the process of developing the Work Breakdown Structure (WBS) of labor hours and labor mix at the task and sublevel task for the independent cost estimate. AR at 278–281. The WBS documented the government's approach for the accomplishment of the individual task orders. *Id.* at 275–281. The government's independent cost estimate contained four labor categories for the written task order and the estimated number of labor hours.[30] *Id.* at 2167.

The record indicates that while ITAC's proposal demonstrated a technical understanding of Iridium (for which the Air Force assigned ITAC's proposal a strength in evaluating this Mission Capability subfactor), the proposal omitted critical processes and milestones for the subtasks outlined in the Core Task Order Scenario. *Id.* at 2141–2142. Specifically, the evaluators found that ITAC's proposal provided insufficient training time for personnel, allowing one day only for conducting a demonstration of its capability with no time for dry runs, set up, or check out. *Id.* at 2142. ITAC's proposal also failed to provide for multiple training sessions at different locations, if required. *Id.* Additionally, the evaluators determined that ITAC's proposed five-month schedule using 948 labor hours for a twelve-month task order period of performance estimated to require 11,112 labor hours was unrealistic. *Id.* at 2141, 2142. Of notable concern to the evaluators was ITAC's own apparent uncertainty regarding its proposed five-month performance schedule evidenced by ITAC's statement in its Task Order Management Plan that "[w]e recommend a period of performance of 1 year to cover unforeseen circumstances." *Id.* at 2142. Comparing ITAC's proposed labor hours to the government's independent estimate of required labor, the evaluation team concluded that ITAC's proposal posed a significant risk to schedule, cost and task performance. *Id.* at 2142. Reviewing ITAC's proposed approach to the Core Task Order Scenario, the evaluating Cost Team concluded that the proposed hours were so minimal and out of line that it was not feasible to perform a Most Probable Cost analysis. *Id.* at 2165. Moreover, on comparison of ITAC's proposal of two labor categories to the government's independent estimate of four labor categories, the evaluators determined that the two labor categories proposed by ITAC demonstrated an inadequate labor mix. *See id.* at 2167.

On review of the administrative record, the court finds that the agency had a rational basis for its evaluation of ITAC's response to the Core Task Order subfactor as high risk. Notwithstanding ITAC's arguments that its

---

**29.** FAR 35.017 describes the role of a Federally Funded Research and Development Center in meeting special research or development needs of the government.

**30.** The proposed labor categories and respective hours included:(1) 0 hours for labor category of SMPS (not defined in the administrative record); (2) 2,576 hours for Senior Member of Technical Staff (SMTS); (3) 4,864 hours for Member of Technical Staff (MTS); and (4) 3,672 hours for Junior Member of Technical Staff (JMTS). AR at 2167. *See also* Oral Arg. Tr. at 97.

use of "off-the-shelf" solutions in its proposal satisfied the government's interest in minimizing costs in the Core Task Order Scenario, *see* Pl.'s Mem. at 23–24, ITAC failed to explain in its proposal how the incorporation of the "off-the-shelf" Iridium technology would support the significant reduction in it proposed labor hours. ITAC's proposal does not resolve, as required by the terms of the RFP, *see* AR at 163, the apparent inconsistency between its proposal and the government's independent cost estimate for the Core Task Order Scenario, and ITAC does not dispute its failure to explain to the Air Force how the readily available Motorola resources supported the low labor estimate it proposed.[31]

Based on the clear requirements of the RFP and the agency's documentation contained in the administrative record, the court concludes that the Air Force's cost evaluation of ITAC's proposal with respect to the Core Task Order Scenario was not unreasonable.

## III. Conclusion

The court finds that plaintiff's claims of prejudicial errors in the procurement process are not supported by the administrative record. Since plaintiff does not prevail on the merits, the court does not further [32] address plaintiff's requests for injunctive relief.

For the foregoing reasons, plaintiff's requests for injunctive relief are DENIED, and defendant's motion for summary judgment on the administrative record is GRANTED.

The court orders the following:

A. The Clerk of the Court is directed to enter judgment for defendant.

B. Each party shall bear its own costs.

C. On or before December 21, 2001, the parties may file requests for deletion of protected/privileged material from the published opinion to be issued by the court. Each such request shall identify with particularity each proposed deletion and the reason therefor.

D. The court proposes to order, at the time the opinion in this matter is published, that all filings in this matter be removed from protective order three years after the entry of a judgment from which no appeal may be taken or after the expiration of any time for appeal after the entry of judgment, whichever first occurs. The parties, or any of them, may, on or before December 21, 2001, show cause why the foregoing proposed order regarding the removal of filings from protective order should not be issued or should be issued with modifications.

IT IS SO ORDERED.

---

**31.** ITAC conceded during oral argument, "I don't know that [such explanation] was specifically stated in ITAC's proposal." Oral Arg. Tr. at 100.

**32.** To obtain a TRO or preliminary injunctive relief, a plaintiff must show: (1) a specific, irreparable injury if the court does not enjoin contract performance; (2) a substantial likelihood of success on the merits; (3) the harm to plaintiff outweighs the harm to defendant; and (4) that granting preliminary relief is in the public interest. 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure (Wright & Miller) § 2948 (1995); *W & D Ships Deck Works, Inc. v. United States*, 39 Fed. Cl. 638, 647 (Fed.Cl.1997) ("When deciding if a TRO is appropriate in a particular case, a court uses the same four-part test applied to motions for a preliminary injunction"). A TRO or preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." 11A Wright & Miller § 2948. Courts reviewing the award of government contracts under the so-called *Scanwell* jurisdiction, *Scanwell Labs., Inc. v. Shaffer*, 424 F.2d 859 (D.C.Cir.1970), advised a stringent application of judicial restraint in the grant of injunctive relief, particularly with respect to the courts's determination of plaintiff's likelihood of success on the merits. *Princeton Combustion Research Labs., Inc. v. McCarthy*, 674 F.2d 1016, 1019 (3d Cir.1982); *Saco Def. Sys. Div. v. Weinberger*, 606 F.Supp. 446, 450 (D.Me.1985). Absent success on the merits, the other factors are irrelevant.